J-A06018-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DARRELL MYERS | |
| Appellee | No. 2774 EDA 2013 |

Appeal from the Order August 27, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): MC-51-CR-0052681-2012

BEFORE: PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                                    **FILED APRIL 17, 2015**

The Commonwealth appeals from the order entered August 27, 2013, in the Philadelphia Court of Common Pleas, denying relief from an order of the Philadelphia Municipal Court that suppressed test results from a warrantless blood draw of appellee, Darrell Myers, who was charged with driving under the influence of alcohol, in violation of 75 Pa.C.S. § 3802(a)(1), DUI — General Impairment, first offense.[1] Based upon the following, we affirm.

From the trial court's opinion, we quote:

---

[1] Pursuant to Pa.R.A.P. 311(d), the Commonwealth has certified in good faith that the trial court's order will terminate or substantially handicap the prosecution of this case, even though Myers was charged with general impairment.

Based upon the record kept in this matter, this Court makes the following findings of fact:

1.     On December 29, 2012, at approximately 3:30 p.m., Officer James Bragg was on patrol in the city and county of Philadelphia. *Motion to Suppress, Notes of Testimony, May 21, 201[3], p. 7*. His tour of duty took him to the location of 64 West Penn street. *Id.*

2.     Officer Bragg received a radio call for a person screaming in the area of 100 West Penn Street. *Id.* at 7. The flash was for a maroon SUV. *Id.* at 8.

3.     As Officer Bragg came down Penn Street, he observed a maroon SUV which had its engine running. *Id.* The vehicle was observed with its brake lights repeatedly going on and off and [Myers] was observed seated in the driver's seat. *Id.* at 8.

4.     Officer Bragg witnessed [Myers] maneuvering the brake pedal himself -- which is to say, he did not have his hazards on and he was the one causing his lights to go [on] and off repeatedly. *Id.* at 8.

5.     The vehicle was in the running lane [i]n front of 64 West Penn Street. *Id.*

6.     Officer Bragg pulled up behind the vehicle with his overhead lights and sirens on. *Id.* at 8, 9. He watched as the male driver exited the vehicle and immediately began staggering towards the officer's car. *Id.* at 9. Officer Bragg had not ordered [Myers] out of the vehicle. *Id.* at 8.

7.     [Myers] tried to say something at that time -- he had very slurred speech, however. The officer could not understand him. *Id.* at 9. The officer convinced him to have a seat on the steps in front of a nearby building. *Id.* at 9.

8.     [Myers] had a moderate smell of alcoholic beverages emanating from his person. *Id.* at 9.

9.     Officer Bragg testified that he has been on the force for five years and come directly into contact with people under the influence of alcohol on a number of occasions. *Id.* at 14, 15.

Based upon his experience and contact with people under the influence, he believed that [Myers] was intoxicated. *See id.* at 12.

10. Further, Officer Bragg saw a brandy bottle on the front seat of the vehicle. *Id.* at 12. He saw the item in plain view. *Id.* [Myers] left his vehicle door open as he stumbled outside during the initial stop. *Id.*

11. On the basis of the foregoing observations, Officer Bragg indicated that he did not believe [Myers] could then safely operate a vehicle. *Id.*

12. Officer Bragg then called a wagon and placed [Myers] under arrest for DUI. *Id.* at 23.

13. Officer Bragg then had [Myers] transported to the hospital to have him medically cleared -- the officer was of the opinion that [Myers] was intoxicated to the point where he needed medical attention and that the PDU would not be able to handle the matter. *Id.* at 23, 24.

14. Later that same day, around 4:45 p.m. on duty Officer [Matthew] Domenic arrived at Einstein Hospital. *Id.* at 25. He had received information that an individual arrested for DUI was at that hospital. *Id.* There, he observed [Myers] in a room in the emergency ward. *Id.* [Myers] was unconscious and unresponsive. *Id.*

15. [Myers] had been given four milligrams of Haldol by medical staff just a few minutes before the officer had arrived. *Id.* at 27.

16. Officer Domenic attempted to make contact with the unconscious [Myers]. *Id.* at 27. He spoke his name several times to no avail. *Id.* at 27, 28. He then proceeded to rea[d] the standard informed consent warnings to [Myers]. *Id.* at 28. [Myers] did not respond. *Id.* at 28.

17. Officer Domenic then requested that RN Kral perform a warrantless blood draw. *Id.* at 28.

18. That blood draw took place at 5:01 p.m. *Id.* at 28. [Two] tubes of blood were provided to the officer. *Id.* They were

placed into a drug scan blood kit and transported back to AID headquarters where they were placed into a secure refrigerator. *Id.*

19.    The blood samples were placed on property receipt number 3078494. *Id*. They received a drug scan ID number and were submitted for testing. *Id.*

20.    [Myers] never signed the informed consent warnings, as he was unconscious and unresponsive. *Id.*

21.    The record is devoid of any evidence that the officers ever requested (or attempted to secure) a warrant prior to the blood draw being carried out.

Trial Court Opinion, 1/17/2014, at 2–4.

On May 21, 2013, Myers proceeded to a hearing before the Municipal Court on his suppression motion.  Myers argued that (1) the physical evidence should be suppressed because Officer Bragg lacked probable cause to arrest him for DUI, and (2) the blood draw should be suppressed because there were no "exigent circumstances that would support a warrantless draw,"[2]  making it illegal under the United States Supreme Court's holding in *Missouri v. McNeely*, 133 S.Ct. 1552 (2013).

The Municipal Court judge granted the suppression motion in part, with respect to the blood draw. The Municipal Court judge concluded that the officers should have obtained a warrant because Myers was unconscious, could not consent, and it "was [not] unreasonable for the Commonwealth to

_____

[2] N.T., 5/21/2013, at 35.

go get a warrant in this situation." N.T., 5/21/2013, at 43–44. In support, the Municipal Court judge cited **McNeely**.

On June 17, 2013, the Commonwealth appealed the Municipal Court's ruling to the Philadelphia Court of Common Pleas. On August 27, 2013, following a hearing, the Honorable Paula Patrick denied the Commonwealth's appeal, and affirmed the decision of the Municipal Court. This appeal followed.[3]

The Commonwealth raises the following question for our review:

> Did the lower court, sitting as an appellate court, err in holding that a warrant was required to obtain blood for a chemical test where the officer had probable cause to believe that [Myers] was driving under the influence of alcohol or a controlled substance?

Commonwealth Brief, at 4.

Our standard of review is well settled:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the [defense] prevailed before the suppression court, we may consider only the evidence of the [defense] and so much of the evidence for the [Commonwealth] as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are

_____

[3] At the same time that the notice of appeal was filed, the Commonwealth filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), even though the trial court had not yet ordered it to do so. On January 17, 2014, Judge Patrick issued an opinion in support of her decision.

supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous…. [T]he suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

**Commonwealth v. Stem**, 96 A.3d 407, 409 (Pa. Super. 2014) (citation omitted).

At issue in this appeal is application of the recent United States Supreme Court decision in **Missouri v. McNeely, supra**. In **McNeely**,

at approximately 2:08 a.m., a Missouri police officer stopped McNeely's truck after observing it exceed the posted speed limit and repeatedly cross the centerline. The officer noticed several signs that McNeely was intoxicated, including McNeely's bloodshot eyes, his slurred speech, and the smell of alcohol on his breath. McNeely acknowledged to the officer that he had consumed "a couple of beers" at a bar, App. 20, and he appeared unsteady on his feet when he exited the truck. After McNeely performed poorly on a battery of field-sobriety tests and declined to use a portable breath-test device to measure his blood alcohol concentration (BAC), the officer placed him under arrest.

The officer began to transport McNeely to the station house. But when McNeely indicated that he would again refuse to provide a breath sample, the officer changed course and took McNeely to a nearby hospital for blood testing. The officer did not attempt to secure a warrant. Upon arrival at the hospital, the officer asked McNeely whether he would consent to a blood test. Reading from a standard implied consent form, the officer explained to McNeely that under state law refusal to submit voluntarily to the test would lead to the immediate revocation of his driver's license for one year and could be used against him in a future prosecution. See Mo. Ann. Stat. §§ 577.020.1, 577.041 (West 2011). McNeely nonetheless refused. The officer then directed a hospital lab technician to take a blood sample, and the sample was secured at approximately 2:35 a.m. Subsequent laboratory testing measured McNeely's BAC at 0.154 percent, which was well above the legal limit of 0.08 percent. See § 577.012.1.

- 6 -

133 S. Ct. 1556–1557.

McNeely sought to suppress the results, arguing that the warrantless blood draw violated his Fourth Amendment rights.[4] The United States Supreme Court granted *certiorari* to resolve the issue "whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." ***Id.*** at 1558. The Court held that "in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." ***Id.*** at 1568.

The ***McNeely*** Court ruled that, "[i]n those driving situations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." ***Id.*** at 1561. The Court continued:

> We do not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test. That, however, is a reason to decide each case on its facts, as we did in ***Schmerber*** [***v. State of California***, 384 U.S. 757 (1966)], not to accept the

---

[4] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

"considerable overgeneralization" that a *per se* rule would reflect.

The context of blood testing is different in critical respects from other destruction-of-evidence cases in which the police are truly confronted with a "'now or never'" situation. In contrast to, for example, circumstances in which the suspect has control over easily disposable evidence, BAC evidence from a drunk-driving suspect naturally dissipates over time in a gradual and relatively predictable manner. Moreover, because a police officer must typically transport a drunk-driving suspect to a medical facility and obtain the assistance of someone with appropriate medical training before conducting a blood test, some delay between the time of the arrest or accident and the time of the test is inevitable regardless of whether police officers are required to obtain a warrant. … Consider, for example, a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer. In such a circumstance, there would be no plausible justification for an exception to the warrant requirement.

*Id.* at 1561 (internal citations omitted).

The Court recognized that "exigent circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant application process." *Id.* at 1563. However, the Court concluded that adopting a *per se* approach "would improperly ignore the current and future technological developments in warrant procedures." *Id.* The Court opined that in a drunk-driving case, whether a warrantless blood draw is reasonable must be determined on a case-by-case basis, considering the totality of the circumstances. *Id.*

In the present case, the trial court, relying on *McNeely*, concluded "the Commonwealth failed to present competent evidence that there was an

exigency which would have justified the officer's decision to order a warrantless blood draw." Trial Court Opinion, 1/17/2014, at 7. The trial court explained:

> The record below is devoid of any evidence indicating that it would have been impracticable or infeasible for the arresting officer (or, for that matter, the officer who ordered the blood sample test at the medical facility) to obtain a warrant in the circumstances. Further, [Myers] was actually unconscious when the blood draw at issue was performed. As such, he did not have the opportunity to decline or refuse to have his blood sample taken on the date in question. [Myers] was unconscious because he was given Haldol upon arriving at the hospital. The arresting officer did not testify that he could not secure a warrant in the time it took to transport [Myers] to the hospital to obtain medical assistance. The arrest took place at approximately 3:30 p.m. — this was not a late-night drunk driving situation where securing a timely warrant might have proven extremely difficult or even impossible. Moreover, [Myers] was given the drugs which rendered him unconscious at approximately 4:40 p.m. The blood test at issue was not performed until 5:01 p.m. The record is devoid of any evidence that the officers did not have sufficient time to seek out and secure a warrant before conducting this blood draw --- both prior to [Myers'] arrival at the hospital and to his becoming unconscious.

Trial Court Opinion, 1/17/2014, at 7–8.

The Commonwealth argues that the trial court's reliance on ***McNeely*** is misplaced, because the ***McNeely*** Court did not consider the issue of whether an implied consent law is an exception to the warrant requirement. Relevant to this argument, the Pennsylvania implied consent statute reads, in pertinent part:

> Any person who drives, operates, or is in actual physical control of the movement of a vehicle in this Commonwealth ***shall be deemed to have given consent*** to one or more chemical tests of breath, blood or urine for the purpose of determining the

alcoholic content of blood … if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a vehicle: … in violation of section … 3802 (relating to driving under the influence of alcohol or controlled substance) ….

75 Pa.C.S. § 1547(a)(1). Section 1547(b)(1) further provides, "if a person placed under arrest for a violation of Section 3802 is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted, but upon notice by the police officer, the department shall suspend the operating privilege of the person …." 75 Pa.C.S. § 1547(b)(1).[5]

_____

[5] In **Commonwealth v. Eisenhart**, 611 A.2d 681, 684 (Pa. 1992), the Pennsylvania Supreme Court held that a **conscious** driver has the explicit right under Section 1547(b) to refuse a blood draw. The Court explained:

> [U]nder the Implied Consent provision, Section 1547(a), testing is allowed absent an affirmative showing of the subject's refusal to consent to the test at the time that the testing is administered. Moreover, his initial consent does not preclude him from revoking his consent to the test. The statute grants an explicit right to a driver who is under arrest for driving under the influence to refuse to consent to chemical testing. The relationship between the Implied Consent provision of Section 1547(a) and the suspension for refusal under Section 1547(b) is such that a driver may revoke his Implied Consent under Subsection (a) by refusing. The sanction of the one year suspension for refusing to consent to the chemical testing is used as an incentive to induce a driver to submit to the test, provided the probable cause requirements of subsection (a) are met.

**Id.** at 683–684. The **Eisenhart** Court held that the blood test results acquired in contravention of a driver's right to refuse consent to blood alcohol testing under the Motor Vehicle Code must be suppressed. The Court specifically noted that the issue of an **unconscious** driver was not before it. **Id.** at 684.

The Commonwealth maintains that under Section 1547(a)(1), where an officer has probable cause to arrest a defendant for DUI, and an unresponsive defendant has not affirmatively refused consent, the officer may conduct a warrantless blood draw. Commonwealth's Brief at 11. In support, the Commonwealth cites *Commonwealth v. Kohl*, 615 A.2d 308 (Pa. 1992), and *Commonwealth v. Keller*, 823 A.2d 1004 (Pa. Super. 2003).

In *Kohl*, the unconscious defendant had his blood drawn for DUI investigative purposes pursuant to then-existing Section 1547(a)(2). The Commonwealth argues:

> [T]he officers in *Kohl* did not have probable cause to believe the individuals were intoxicated. The Supreme Court affirmed suppression. Notably, the Supreme Court clarified that implied consent is constitutional so long as the officer has probable cause, hypothesizing: "Indeed, if the police officers had observed any signs of intoxication, the blood tests would have been authorized." *Kohl*, 615 at 31[6].

Commonwealth's Brief at 13.[6]

The Commonwealth also relies on *Keller*, wherein the defendant was involved in a one-vehicle accident. A state trooper on the scene noticed the defendant had an odor of alcohol, as well as glassy and bloodshot eyes. Due

---

[6] We are aware that the *Kohl* Court added to its discussion that "if the police officers had observed any signs of intoxication, the blood tests would have been authorized by 75 Pa.C.S.A. § 1547(a)(1)." However, as will be discussed, the issue of Section 1547(a)(1) was not before the *Kohl* Court, which addressed the constitutionality of Section 1547(a)(2).

to his injuries, the defendant was transported to the hospital. He was read his *O'Connell*[7] warnings, but the trooper could not remember the defendant's response. State police requested a blood draw, which indicated a BAC well in excess of the legal limit. Under these circumstances, this Court concluded that the implied consent provision, 75 Pa.C.S. § 1547(a)(1), did not violate the defendant's rights against unreasonable search and seizure under the Pennsylvania Constitution.

Myers relies on *McNeely*, and argues that because the Commonwealth failed to show exigency or an effort to get a warrant, this Court should affirm the trial court. *See* Myers' Brief at 6–7. Myers argues that the Commonwealth's reliance on the implied consent law as a *per se* rule that permits the involuntary taking of a person's blood when there is probable cause to believe the person committed a drunk driving offense, is inconsistent with *McNeely*, which rejected a *per se* rule. *See id.* at 8.

Moreover, Myers contends "he was deprived of his statutory right to refuse the taking of his blood[,]" and police cannot "then use his inability to verbally refuse as the basis to involuntarily take his blood." *Id.* at 9. Myers further argues "[Pennsylvania's implied consent law] penalizes the refusal to consent to a blood draw. It does not permit the involuntary seizure of a blood sample." Myers' Brief at 11–12.

---

[7] *See Com., Dept. of Transp., Bureau of Traffic Safety v. O'Connell*, 555 A.2d 873 (Pa. 1989).

Upon review, we agree with Myers that the trial court properly denied relief to the Commonwealth. Our reasons are as follows.

First, in **Kohl**, the only issue before the Court was the constitutionality of then-existing Section 1547(a)(2). In addition, **Keller** is distinguishable on its facts, in that the arresting officer could not remember defendant's response when he was advised of his right to refuse blood testing. Furthermore, **Keller** discussed the interplay between the implied consent statute and 75 Pa.C.S. § 3755,[8] which is not at issue herein. Although the Commonwealth argues that **Keller** applies with "full force" to the present case "[b]ecause the officer here had probable cause to arrest for DUI and [Myers] did not affirmatively refuse his consent,"[9] the Commonwealth ignores the fact that under the **unique** circumstances of this case, Myers could not be warned or respond because medication administered by

_____

[8] Section 3755 provides, in pertinent part:

> If, as a result of a motor vehicle accident, the person who drove … requires medical treatment in an emergency room of a hospital and if probable cause exists to believe a violation of section 3802 (relating to driving under influence of alcohol or controlled substance) was involved, the emergency room physician or his designee shall promptly take blood samples from those persons ….

75 Pa.C.S. § 3755.

[9] Commonwealth's Brief at 14.

hospital staff had rendered him unconscious. This fact brings us to the next point.

Pennsylvania's implied consent statute provides a driver under arrest with the statutory right of refusal to blood testing, ***see*** 75 Pa.C.S. § 1547(b)(1) ("If any person placed under arrest for a violation of section 3802 is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted …."). As discussed, Section 1547 provides for chemical testing when consent is not withdrawn pursuant to subsection (b)(1), and precludes a blood draw when consent is withdrawn and imposes penalties.[10] Here, Myers was arrested for DUI and transported to the hospital, but was not given the applicable warnings until a later time, at which point he could not claim the statutory protection of Section 1547(b)(1).

The facts of record show that Officer James Bragg encountered Myers at approximately 3:30 P.M. This encounter did not result from a vehicular accident, but rather from Officer Bragg responding to a report of a person screaming in the area of 100 West Penn Street. Officer Bragg observed a maroon SUV in the running lane, and saw Myers exit the vehicle and stagger toward the police vehicle. N.T., 5/21/2013, at 7–8. Based on Officer

_____

[10] ***See*** 75 Pa.C.S. § 1547(b) ("Suspension for refusal"), and (e) ("Refusal admissible in evidence").

- 14 -

Bragg's observations, he arrested Myers for DUI, and called for a wagon to transport him to the hospital "because he appeared to be intoxicated to a point where he needed medical attention." *Id.* at 24. Later, at 4:45 p.m., Officer Matthew Domenic, who was the chemical testing officer, appeared at the hospital.[11] *Id.* at 25.

Officer Domenic observed that Myers was unconscious and unresponsive, and learned that Myers' unconsciousness was due to Haldol that hospital staff had administered to Myers minutes earlier, at approximately 4:40 p.m. *Id.* at 27. Officer Domenic attempted to make contact with Myers by speaking his name and tapping him on the shoulder, but there was no response. Officer Dominic then proceeded to give Myers the *O'Connell* warnings and still receiving no response, ordered the blood draw. The blood draw did not occur until 5:01 P.M. *Id.* at 27–28.

Finally, we consider the import of *McNeely*. As discussed above, in *McNeely*, the United States Supreme Court held "in drunk-driving investigations, ***the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case*** sufficient to justify conducting a blood test without a warrant." *Id.* at 1568 (emphasis added).

---

[11] As we have noted, this is not a case where the hospital was required to withdraw blood. *See* 75 Pa.C.S. § 3755. The Commonwealth relies solely on the implied consent statute for the blood draw.

We recognize this case differs from **McNeely** where the blood draw was nonconsensual. Nevertheless, because police did not act pursuant to the implied consent law until 4:45 p.m., after Myers had been rendered unconscious by an intervening cause that occurred subsequent to his DUI arrest and transport to the hospital, we conclude **McNeely** controls here. Further, we agree with the trial court that the Commonwealth failed to justify the failure to obtain a warrant prior to the 5:01 p.m. blood draw. Therefore, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/17/2015