**[J-94-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 7 EAP 2016 |
| | : | |
| Appellant | : | Appeal from the Judgment of Superior |
| | : | Court entered on 6/15/2015 at No. 2774 |
| | : | EDA 2013 (reargument denied |
| v. | : | 8/7/2015) affirming the Order entered on |
| | : | 8/27/2013 in the Court of Common |
| | : | Pleas Philadelphia County, Criminal |
| DARRELL MYERS, | : | Division at no. MC-51-CR-0052681- |
| | : | 2012. |
| Appellee | : | |
| | : | ARGUED:  September 14, 2016 |

*Justice Wecht delivers the Opinion of the Court with respect to Parts I, II(A), II(B), and II(D), and announces the Judgment of the Court.  The opinion is joined in full by Justices Donohue and Dougherty.  Justice Todd joins Parts I, II(A), II(B), and II(D) of the opinion, as well as its mandate.  Chief Justice Saylor files a concurring opinion, joined in full by Justice Baer and joined in part by Justice Donohue.  Justice Mundy files a dissenting opinion.*


**<u>OPINION</u>**


**JUSTICE WECHT**[1]                                                    **DECIDED:  July 19, 2017**

When a motorist drives on a road in Pennsylvania, the motorist is "deemed to have given consent" to chemical testing to determine whether he or she is driving under the influence of alcohol or a controlled substance ("DUI"), provided that a police officer first develops "reasonable grounds" to suspect such impairment.  75 Pa.C.S. § 1547(a).  Nonetheless, this "implied consent" statute also grants DUI arrestees the right to refuse chemical testing.  *See id.* § 1547(b)(1) ("If any person placed under arrest for [DUI] is

---

[1]     This matter was reassigned to this author.

requested to submit to chemical testing and refuses to do so, the testing shall not be conducted"); *Commonwealth v. Eisenhart*, 611 A.2d 681, 683 (Pa. 1992) ("The statute grants an explicit right to a driver who is under arrest for [DUI] to refuse to consent to chemical testing."). Refusal to submit to a chemical test comes with its own set of consequences, and both the statute and this Court's precedents require a police officer who is requesting a chemical test to inform an arrestee of those consequences. *See* 75 Pa.C.S. § 1547(b)(2) (prescribing the "duty of the police officer" to inform a DUI arrestee of the consequences of refusal); *Pa. Dep't of Transp., Bureau of Traffic Safety v. O'Connell*, 555 A.2d 873, 877 (Pa. 1989) ("The law has always required that the police must tell the arrestee of the consequences of a refusal to take [a chemical] test so that he can make a knowing and conscious choice.").[2]

In this case, we granted allowance of appeal to consider the lawfulness of a warrantless blood draw conducted upon a motorist who, having been arrested for DUI, had then been rendered unconscious by medical personnel before a police officer provided *O'Connell* warnings[3] and before the officer requested the motorist's submission to a chemical test. The Philadelphia Municipal Court, the Court of Common Pleas, and the Superior Court all held that a blood draw conducted under these circumstances is impermissible, and that the results of the derivative blood test are accordingly inadmissible at trial. Because the seizure of Darrell Myers' blood violated Pennsylvania's implied consent statute, 75 Pa.C.S. § 1547, and because no other circumstances justified the failure to obtain a search warrant, we affirm.

---

[2]     *See infra* Part II.A.

[3]     *See O'Connell, supra. O'Connell* warnings are the standard advisement of the requirements of Pennsylvania's implied consent law and the consequences of refusal to submit to a requested chemical test. *See also Pa. Dep't of Transp., Bureau of Driver Licensing v. Weaver*, 912 A.2d 259 (Pa. 2006) (addressing the required content of *O'Connell* warnings).

## I. Background

On December 29, 2012, at approximately 3:30 p.m., Philadelphia Police Officer James Bragg was on routine patrol when he received a radio call indicating that there was a person screaming in the vicinity of 100 West Penn Street. The radio call warned Officer Bragg to be on the lookout for a maroon SUV. When Officer Bragg arrived on West Penn Street, he observed a vehicle matching that description with its engine running and its brake lights repeatedly flickering on and off. A man later identified as Myers was sitting in the driver's seat. Officer Bragg activated his siren and emergency lights and pulled up behind the maroon SUV. Myers exited the vehicle and began to stagger toward the officer, even though he had not been ordered to step out of the vehicle. Myers tried to speak, but his speech was so slurred that Officer Bragg could not understand what he was saying. Officer Bragg detected the smell of alcohol emanating from Myers, and observed a bottle of brandy on the front seat of the SUV. The bottle was in plain view, as Myers had left the driver's door open when he exited the vehicle. Based upon his observations and experience, Officer Bragg believed that Myers was intoxicated to the point that he required medical attention. Officer Bragg placed Myers under arrest for DUI and called for a wagon, which transported Myers to Einstein Medical Center.

Around 4:45 p.m. that same day, Philadelphia Police Officer Matthew Domenic arrived at Einstein Medical Center, having been informed that an individual at that hospital had been arrested for DUI. A few minutes before Officer Domenic arrived, however, the hospital staff administered four milligrams of Haldol[4] to Myers, rendering

---

[4] Haldol is a brand name of the antipsychotic medication known as Haloperidol, which is used to treat certain nervous, emotional, or mental conditions. *See* U.S. Nat'l Library of Med., NAT'L INSTS. OF HEALTH, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010538/?report=details (last visited March 7, 2017).

him unconscious. Officer Domenic attempted to communicate with Myers by speaking his name and tapping him on the shoulder, but Myers was unresponsive. Nevertheless, Officer Domenic read *O'Connell* warnings to Myers. Myers, still unconscious, was unable to respond in any manner. Officer Domenic then instructed a nurse to draw Myers' blood. It is undisputed that neither Officer Bragg nor Officer Domenic attempted to secure a search warrant for this blood draw. It also is undisputed that, due to his unconscious state, Myers could neither hear Officer Domenic nor sign the implied consent warnings.

The Commonwealth charged Myers with DUI.[5] Myers filed a pre-trial motion to suppress the evidence derived from the blood draw, which he alleged had been conducted in violation of his rights under the Fourth Amendment to the United States Constitution[6] and Article I, Section 8 of the Pennsylvania Constitution.[7] Myers argued that Officer Bragg lacked probable cause to arrest him for DUI, and that the blood draw

---

[5]    *See* 75 Pa.C.S. § 3802(a)-(c).

[6]    The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

[7]    Article I, Section 8 of the Pennsylvania Constitution provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8.

was unlawful under the decision of the Supreme Court of the United States in *Missouri v. McNeely*, __ U.S. __, 133 S.Ct. 1552 (2013), because the police did not obtain a search warrant and because no exigent circumstances justified the warrantless search of his blood.

In *McNeely*, a plurality of the United States Supreme Court explained that, because a blood draw unquestionably is a search within the meaning of the Fourth Amendment, a warrant generally is required, unless one of the exceptions to the warrant requirement applies. *Id.* at 1558. One such exception exists for searches based upon exigent circumstances, "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). Missouri sought a *per se* rule that the natural dissipation of alcohol from the bloodstream always is an exigent circumstance, such that there never is a need for a warrant for a blood draw in DUI cases. *Id.* at 1560. The Court rejected Missouri's argument, instead concluding that whether exigent circumstances exist in DUI cases must be determined in each individual case, based upon the totality of the circumstances. *Id.* at 1561-62.

Following a suppression hearing on May 21, 2013, the Philadelphia Municipal Court granted Myers' motion and suppressed the results of the blood draw. The Municipal Court concluded that, although probable cause existed for the DUI arrest, the officers were required to obtain a warrant for the blood draw because Myers' unconscious state prevented him from consenting or refusing, and because no exigent circumstances were present. Considering the totality of the circumstances as required by *McNeely*, the Municipal Court concluded that it would not have been unreasonable for the police to obtain a warrant before having Myers' blood drawn.

The Commonwealth appealed to the Court of Common Pleas, which affirmed the Municipal Court's suppression order. The trial court, also applying *McNeely*, concluded that the Commonwealth failed to show "that it would have been impracticable or infeasible for [either officer] to obtain a warrant in the circumstances." Trial Court Opinion, 1/17/2014, at 7. In addition, the trial court concluded that, because Myers was unconscious at the time of the blood draw, "he did not have the opportunity to decline or refuse to have his blood sample taken on the date in question." *Id.* at 8.

The Superior Court affirmed. *Commonwealth v. Myers*, 118 A.3d 1122 (Pa. Super. 2015). Examining the implied consent statute, the Superior Court noted that Subsection 1547(b)(1) "provides a driver under arrest with [a] statutory right of refusal to blood testing." *Id.* at 1129 (quoting 75 Pa.C.S. § 1547(b)(1)). Because Myers was unconscious at the time that Officer Domenic requested the blood draw, the court observed that Myers "could not claim the statutory protection" of Subsection 1547(b)(1). *Id.* The Superior Court further relied upon *McNeely*, and held that, "because police did not act pursuant to the implied consent law until 4:45 p.m., after Myers had been rendered unconscious by an intervening cause that occurred subsequent to his DUI arrest and transport to the hospital, we conclude *McNeely* controls here." *Id.* at 1130. Like the trial court, the Superior Court determined that the Commonwealth failed to demonstrate the impracticability of obtaining a warrant prior to the blood draw. Therefore, the panel held that the trial court correctly affirmed the Municipal Court's order granting Myers' motion to suppress. The Commonwealth sought reargument *en banc*, which was denied. We granted the Commonwealth's petition for allowance of appeal.[8]

---

[8]    Adopting the Commonwealth's formulation verbatim, we granted review of the following issue:

(continued…)

## II. Analysis

Before this Court, the Commonwealth argues that the implied consent statute establishes a valid exception to the warrant requirement of the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, and that the statutory right to refuse chemical testing does not apply to unconscious arrestees. The Commonwealth's central premise is that, under 75 Pa.C.S. § 1547(a), "any individual who exercises the privilege of driving in Pennsylvania has consented to a blood draw." Brief for Commonwealth at 17 (emphasis omitted). Although a conscious individual may refuse to submit to a chemical test, the Commonwealth asserts that "[t]here is no law in Pennsylvania that treats an unconscious defendant as having revoked his already-provided consent." *Id.* The Commonwealth faults the Superior Court for "distinguish[ing] between conscious and unconscious drivers without any analysis." *Id.* at 24 (emphasis omitted). In the Commonwealth's view, an arrestee's state of consciousness matters only to the extent that "[u]nconsciousness . . . prevents the suspect from refusing the blood draw," but it "does not somehow negate his existing consent." *Id.* at 22.[9]

---

(…continued)

> Did the Superior Court err in holding, in a published decision, that a warrant was required to obtain blood for a chemical test where the officer had probable cause to believe that [Myers] was driving under the influence of alcohol or a controlled substance, and [Myers] did not affirmatively refuse consent?

*Commonwealth v. Myers*, 131 A.3d 480 (Pa. 2016) (*per curiam*).

[9] The Pennsylvania District Attorneys Association ("PDAA") filed an *amicus curiae* brief in support of the Commonwealth. PDAA argues that the blood draw conducted upon Myers was permissible under the implied consent statute and that the Superior Court erred in applying *McNeely* to the facts of this case.

Myers responds to the Commonwealth's arguments on both statutory and constitutional grounds. With regard to the authority granted to law enforcement personnel under the statute, Myers contends that Pennsylvania's implied consent scheme "does not actually permit the involuntary taking of a blood sample," but, rather, "it penalizes a person for refusing to permit the taking of a sample." Brief for Myers at 12. Myers argues that, "because [he] was forcibly medicated and rendered unconscious, he was deprived of his statutory right to refuse the taking of his blood." *Id.* at 13 (footnote omitted). In addition to asserting that the blood draw was impermissible under the implied consent statute, Myers bases much of his argument upon the decisions of the Supreme Court of the United States in *McNeely* and *Birchfield v. North Dakota*, __ U.S. __, 136 S.Ct. 2160 (2016), the latter of which was decided during the pendency of this appeal.

In *Birchfield*, the Supreme Court addressed the constitutionality of warrantless searches of breath and blood under the Fourth Amendment, specifically with regard to the search-incident-to-arrest and consent exceptions to the warrant requirement. The Court concluded that "the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving[,]" but "reach[ed] a different conclusion with respect to blood tests." *Id.* at 2184. Because obtaining a blood sample is significantly more intrusive than a breath test, the Court determined that a blood test may not be administered as a search incident to arrest. *Id.* at 2185. Following that conclusion, the Court considered whether warrantless blood tests may be justified under state implied consent laws. Noting that its "prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply," the Court concluded:

> It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to

submit to such a test. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads.

*Id.* Accordingly, the Court determined that a warrantless blood draw cannot be justified by implied consent where the refusal to submit to the test subjects an individual to criminal penalties. *Id.* at 2186.

With regard to the constitutional dimension of this case, Myers argues that the warrantless blood draw requested by Officer Domenic was unlawful under *Birchfield*, and that the implied consent statute did not cure the constitutional infirmity. *See* Brief for Myers at 7-9. Further, *McNeely* held that the dissipation of alcohol in the bloodstream does not establish a *per se* exigency. Therefore, Myers contends, if the Commonwealth sought to rely upon exigent circumstances, the totality of the circumstances must have demonstrated an actual exigency. Because the Commonwealth did not establish any exigency, Myers contends that no valid exception to the warrant requirement justified the blood draw, and the results of that blood draw correctly were suppressed. *Id.* at 15-16.[10]

The Commonwealth filed its principal brief before *Birchfield* was decided. Accordingly, the Commonwealth responded to Myers' arguments regarding that decision in a reply brief. The Commonwealth contends that, as it related to implied consent laws, the primary concern in *Birchfield* was that consent to a search could not be coerced by the threat of criminal penalties. Here, the Commonwealth argues, "[a]ny potential coercive effect of the statute was irrelevant, because [Myers] was unconscious and so could not be coerced." Reply Brief for Commonwealth at 3. The

---

[10] The Pennsylvania Association of Criminal Defense Lawyers ("PACDL") filed an *amicus curiae* brief in support of Myers. PACDL also relies heavily upon *Birchfield*, argues that Pennsylvania's implied consent scheme is unconstitutionally coercive, and asserts that it may not serve as an exception to the warrant requirement.

Commonwealth further maintains that *McNeely* has no application to this case, because *McNeely* considered only the exigent circumstances exception to the warrant requirement, and the Commonwealth is relying upon the consent exception, not exigent circumstances. *Id.* at 7-8.

The parties' arguments broadly relate to two distinct inquiries: whether the blood draw conducted in this case was authorized by the implied consent statute, and whether the blood draw otherwise was permissible under the Fourth Amendment and under Article I, Section 8 of the Pennsylvania Constitution. We first consider the language of the implied consent statute and our prior interpretations of the statute's requirements. In construing the statute, we remain mindful that the chemical tests contemplated by the implied consent statute are searches within the meaning of the Fourth Amendment. *See Schmerber v. California*, 384 U.S. 757, 767 (1966) (administration of a blood test "plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment."); *Skinner v. Ry. Labor Exec.'s Ass'n*, 489 U.S. 602, 616-17 (1989) (administration of a breath test "implicates similar concerns about bodily integrity" and "should also be deemed a search.") Accordingly, our analysis must comport with the constitutional concerns underlying the statute. Our consideration of the implied consent statute involves a question of statutory interpretation, over which our standard of review is *de novo* and our scope of review is plenary. *See Commonwealth v. Kingston*, 143 A.3d 917, 921 (Pa. 2016).

### A.    Operation of the implied consent scheme

The implied consent statute provides, in relevant part:

**(a) General rule.--** Any person who drives, operates or is in actual physical control of the movement of a vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable

grounds to believe the person to have been driving, operating or in actual physical control of the movement of a vehicle:

> (1) in violation of section . . . 3802 (relating to driving under influence of alcohol or controlled substance). . . .

> \* \* \*

**(b) Suspension for refusal.--**

> (1) If any person placed under arrest for a violation of section 3802 is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person as follows:

>> (i) Except as set forth in subparagraph (ii), for a period of 12 months.

>> (ii) For a period of 18 months if any of the following apply:

>>> (A) The person's operating privileges have previously been suspended under this subsection.

>>> (B) The person has, prior to the refusal under this paragraph, been sentenced for:

>>>> (I) an offense under section 3802;

>>>> (II) an offense under former section 3731;

>>>> (III) an offense equivalent to an offense under subclause (I) or (II); or

>>>> (IV) a combination of the offenses set forth in this clause.

> (2) It shall be the duty of the police officer to inform the person that:

>> (i) the person's operating privilege will be suspended upon refusal to submit to chemical testing; and

>> (ii) if the person refuses to submit to chemical testing, upon conviction or plea for violating section 3802(a)(1), the person will be subject to the penalties provided in section 3804(c) (relating to penalties).

* * *

> **(e) Refusal admissible in evidence.--**In any summary proceeding or criminal proceeding in which the defendant is charged with a violation of section 3802 or any other violation of this title arising out of the same action, the fact that the defendant refused to submit to chemical testing as required by subsection (a) may be introduced in evidence along with other testimony concerning the circumstances of the refusal. No presumptions shall arise from this evidence but it may be considered along with other factors concerning the charge.

75 Pa.C.S. § 1547.

As indicated in Subsection 1547(b)(2)(ii), this provision is related closely to the statute prescribing penalties for DUI convictions, 75 Pa.C.S. § 3804. Pennsylvania law classifies and penalizes DUI offenses pursuant to a three-tiered hierarchy, which is based upon the severity of the offense. In the lowest tier, called "general impairment," an individual commits an offense when he drives a vehicle either "after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving," 75 Pa.C.S. § 3802(a)(1), or with a blood alcohol concentration ("BAC") of at least 0.08% but less than 0.10%. *Id.* § 3802(a)(2). The middle tier, "high rate of alcohol," prohibits driving a vehicle when one's BAC is at least 0.10% but less than 0.16%. *Id.* § 3802(b). The highest tier, "highest rate of alcohol," prohibits driving a vehicle when one's BAC is 0.16% or above. *Id.* § 3802(c).

The penalties imposed for DUI convictions are prescribed by 75 Pa.C.S. § 3804. Each tier of DUI offense triggers its own range of penalties, which become more severe at each level. *See id.* § 3804(a)-(c). With regard to the consumption of alcohol, the middle and highest tiers are designated only by BAC, but, where an individual refuses to submit to a chemical test under 75 Pa.C.S. § 1547(b)(1), no evidence of the individual's BAC will exist. A prosecution for DUI, therefore, can proceed only under "general impairment," requiring proof that the individual had driven "after imbibing a sufficient

amount of alcohol such that the individual is rendered incapable of safely driving." 75 Pa.C.S. § 3802(a)(1). Subsection 3804(c), however, provides that an individual who refused to submit to chemical testing and is convicted under "general impairment," is not subject to the penalties ordinarily prescribed for that tier, but automatically becomes subject to the penalties corresponding to the highest tier.[11] In short, a motorist who refuses to submit to a chemical test, if later convicted of DUI, automatically is subject to the highest range of penalties applicable to DUI offenses.

By operation of the implied consent statute, once a police officer establishes reasonable grounds to suspect that a motorist has committed a DUI offense, that motorist "shall be deemed to have given consent to one or more chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance." 75 Pa.C.S. § 1547(a). Notwithstanding this provision, Subsection 1547(b)(1) confers upon all individuals under arrest for DUI an explicit statutory right to refuse chemical testing, the invocation of which triggers specified consequences. *See* 75 Pa.C.S. § 1547(b)(1) ("If any person placed under arrest for [DUI] is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted"); *Eisenhart*, 611 A.2d at 683 ("The statute grants an explicit right to a driver who is under arrest for [DUI] to refuse to consent to chemical testing.").

Under this statutory scheme, a motorist placed under arrest for DUI has a critical decision to make. The arrestee may submit to a chemical test and provide the police with evidence that may be used in a subsequent criminal prosecution, or the arrestee

---

[11]    *See* 75 Pa.C.S. §3804(c) (providing that "[a]n individual who violates section 3802(a)(1) and refused testing of blood or breath" shall be subject to the same penalties applicable to "highest rate of alcohol").

may invoke the statutory right to refuse testing, which: (i) results in a mandatory driver's license suspension under 75 Pa.C.S. § 1547(b)(1); (ii) renders the fact of refusal admissible as evidence in a subsequent DUI prosecution pursuant to 75 Pa.C.S. § 1547(e); and (iii) authorizes heightened criminal penalties under 75 Pa.C.S. § 3804(c) if the arrestee later is convicted of DUI. In very certain terms, this Court has held that, in requesting a chemical test, the police officer must inform the arrestee of the consequences of refusal and notify the arrestee that there is no right to consult with an attorney before making a decision. *See O'Connell*, 555 A.2d at 877-78.[12] "An arrestee is entitled to this information so that his choice to take a [chemical] test can be knowing and conscious." *Id.* at 878. The choice belongs to the arrestee, not the police officer.

## B. The right of refusal applies to unconscious arrestees.

The Commonwealth argues that the right of refusal under Subsection 1547(b)(1) does not apply to unconscious individuals, who are not entitled to revoke their "already-provided consent." Brief for Commonwealth at 17. The Commonwealth relies upon this Court's comment in *Eisenhart* that "[t]he issue of the unconscious driver or a driver whose blood is removed for medical purposes is not before us today, but is currently pending before this Court in another matter."[13] 611 A.2d at 684. The *Eisenhart* Court

---

[12]　As noted, the implied consent statute, itself, states that "[i]t shall be the duty of the police officer" to inform the arrestee of the consequences of refusal. 75 Pa.C.S. § 1547(b)(2). This unambiguous statutory command leaves no doubt regarding the obligations of the police officer requesting the arrestee's submission to a chemical test. *See Weaver*, 912 A.2d at 267 (Baer, J., dissenting) (purpose of the subsection "is to entitle arrestees to the information necessary to assess the dire consequences they face if they fail to consent to chemical testing, to ensure their choice in that regard is knowing and conscious, as we described in *O'Connell*").

[13]　The other matter to which the *Eisenhart* Court referred was *Commonwealth v. Kohl*, 615 A.2d 308 (Pa. 1992). However, the *Kohl* Court did not base its holding upon the distinction between conscious and unconscious drivers. Instead, *Kohl* held that Subsection 1547(a)(2) was unconstitutional because it permitted chemical testing of any person who operated a motor vehicle that was involved in an accident requiring medical (continued…)

held that "there is an absolute right to refuse, and . . . blood test results acquired in contravention of that right must be suppressed." *Id.* at 682. However, the Court restricted this holding to the right of the "conscious driver" to refuse testing. *Id.* at 684.[14]

Although this Court has not reached the question of unconsciousness in previous cases, the statute's unambiguous language indicates that the right of refusal applies without regard to the motorist's state of consciousness. Subsection 1547(b)(1) does not distinguish in any way between conscious and unconscious individuals, but, rather,

---

(…continued)

treatment, which, in the absence of a requirement of probable cause to suspect DUI, purported to authorize unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. *Id.* at 314-16.

[14] The Commonwealth also relies upon this Court's statement in *Commonwealth v. Riedel*, 651 A.2d 135, 142 (Pa. 1994), that "[w]e will not reformulate the law to grant an unconscious driver or driver whose blood was removed for medical purposes the right to refuse to consent to blood testing." *See* Brief for Commonwealth at 18. However, the *Riedel* Court did not rely upon any distinction between consciousness and unconsciousness, and held that the motorist in that case had no statutory right to refuse testing because he "was not under arrest at the time the blood test was administered and cannot claim the explicit statutory protection of section 1547(b)." *Riedel*, 651 A.2d at 142. Furthermore, the blood test in *Riedel* was not effectuated pursuant to Section 1547, but was conducted by hospital staff for medical purposes. *Id.* at 137-38. The police officer requested the results of that test under the authority of a different statute that instructs medical personnel to draw a driver's blood, have the blood tested, and release the test results to the government if the driver was involved in a motor vehicle accident, requires medical treatment, and there is probable cause to suspect DUI. *See* 75 Pa.C.S. § 3755(a). The passage from *Riedel* upon which the Commonwealth relies was merely a rejection of the motorist's argument that the Subsection 1547(b)(1) right of refusal should apply to a police officer's request for blood test results under Section 3755. The *Riedel* Court did not base its conclusion upon the motorist's state of consciousness, but, rather, concluded that the right of refusal did not apply to the motorist because he was not under arrest when his blood was drawn—a holding entirely consistent with the language of Subsection 1547(b)(1). Thus, despite the Commonwealth's selective reliance upon a decontextualized sentence that may appear, in isolation, to support its position, *Riedel* does not lend strength to the Commonwealth's argument. Under Subsection 1547(b)(1), the critical fact is not whether the motorist is conscious, but whether the motorist is under arrest.

provides the statutory right of refusal to "*any person* placed under arrest" for DUI. 75 Pa.C.S. § 1547(b)(1) (emphasis added). By its plain meaning, "any person" necessarily includes an unconscious person.

The Commonwealth alleges that the Superior Court drew a flawed distinction between conscious and unconscious motorists. *See* Brief for Commonwealth at 24 (arguing that the Superior Court "distinguished between conscious and unconscious drivers without *any* analysis," and that neither the statute nor this Court have made such a distinction) (emphasis in original). The Commonwealth misunderstands the Superior Court's reasoning. The Superior Court concluded that the statutory right of refusal applied to Myers because he was under arrest for DUI—just as it would apply to a conscious individual under arrest for DUI—but that his unconsciousness prevented him from deciding whether to exercise his right to refuse. *See Myers*, 118 A.3d at 1129. In other words, the Superior Court drew no distinction between conscious and unconscious motorists, and, in accordance with the plain meaning of Subsection 1547(b)(1), concluded that the right of refusal applied because of Myers' status as an arrestee. It is the Commonwealth that distinguishes erroneously between conscious and unconscious motorists by arguing that the right of refusal which applies to "any person placed under arrest" for DUI does not apply to an unconscious arrestee.

Accordingly, we hold that Myers had an absolute right to refuse chemical testing pursuant to the implied consent statute, that his unconscious state prevented him from making a knowing and conscious choice as to whether to exercise that right, and that the implied consent statute does not authorize a blood test conducted under such circumstances.

**C.** **Implied consent is not an independent exception to the warrant requirement.**[15]

Having determined that the statutory right of refusal applies to all DUI arrestees without regard to an arrestee's state of consciousness, we next consider the consequence that flows from the deprivation of that right. The Commonwealth argues that the blood draw conducted in this case was authorized because, in the absence of an express refusal to submit to a chemical test, the implied consent provision dispenses with the need to obtain a warrant. In support, the Commonwealth cites several statements from this Court's previous decisions which suggest that implied consent may serve as an exception to the warrant requirement. *See* Brief for Commonwealth at 15 (quoting *Riedel*, 651 A.2d at 139 (listing exceptions to the warrant requirement, including "actual consent, *implied consent*, search incident to lawful arrest, and exigent circumstances") (emphasis added); *Kohl*, 615 A.2d at 315 (stating that "the implied consent provisions . . . dispense with the need to obtain a warrant" where a police officer has probable cause to suspect DUI)).

Although our main focus is upon interpretation of the implied consent statute, we nonetheless observe that the provisions of the statute are subject to the constitutional limitations imposed upon the searches that the statute contemplates. The statute cannot authorize what the Fourth Amendment or Article I, Section 8 would prohibit. Under the federal and state constitutions, it is axiomatic that "[a] search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." *Commonwealth v. Strickler*,

---

[15] Throughout Part II.C of this Opinion, usage of "we" refers to the three Justices joining this section, namely Justice Donohue, Justice Dougherty, and the present author.

757 A.2d 884, 888 (Pa. 2000). One such exception is voluntary consent to a search. *See id.* at 888-89; *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). When a search is premised upon consent, "the Fourth and Fourteenth Amendments require [the government to] demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 248. Voluntariness of consent is a question of fact, which must be determined by consideration of the totality of the circumstances in a given case. *Id.* at 248-49. Relevant to the present inquiry, the concept of implied consent ostensibly relies upon the consent exception to the warrant requirement.

In recent years, a multitude of courts in our sister states have interpreted their respective—and similar—implied consent provisions and have concluded that the legislative proclamation that motorists are deemed to have consented to chemical tests is insufficient to establish the voluntariness of consent that is necessary to serve as an exception to the warrant requirement. *See, e.g.*, *Williams v. State*, 771 S.E.2d 373, 377 (Ga. 2015) (collecting cases and noting that "what the cases seem to indicate is that mere compliance with statutory implied consent requirements does not, *per se*, equate to actual, and therefore voluntary, consent on the part of the suspect so as to be an exception to the constitutional mandate of a warrant").

In some circumstances, courts have focused upon the constitutional requirement that consent always must be revocable. *See, e.g.*, *Florida v. Jimeno*, 500 U.S. 248, 252 (1991) ("A suspect may of course delimit as he chooses the scope of the search to which he consents."). Voluntariness is always the touchstone of the analysis. In *Byars v. State*, 336 P.3d 939, 946 (Nev. 2014), for example, the Supreme Court of Nevada held that a provision of Nevada's implied consent statute was unconstitutional in that "the statute does not allow a driver to withdraw consent, thus a driver's so-called

consent cannot be considered voluntary." The Supreme Court of Idaho similarly has rejected an interpretation of that state's implied consent statute that would render consent irrevocable. *See State v. Wulff*, 337 P.3d 575, 581 (Idaho 2014) ("[I]rrevocable implied consent operates as a *per se* rule that cannot fit under the consent exception because it does not always analyze the voluntariness of that consent."). To afford its statute a constitutional construction, the *Wulff* Court held that "Idaho's implied consent statute must jump two hurdles to qualify as voluntary: (1) drivers give their initial consent voluntarily and (2) drivers must continue to give voluntary consent." *Id.* at 582.

Even where implied consent statutes establish a clear right of refusal, as is the case in Pennsylvania, numerous state courts have concluded that implied consent laws which provide that motorists are deemed to consent to chemical tests do not, in themselves, serve as exceptions to the warrant requirement. Rather, the statutes authorize a police officer to request a motorist's submission to a chemical test, at which point the motorist must choose either (a) to comply with the test or (b) to refuse and accept the consequences that accompany refusal. Voluntariness of the motorist's consent at the time of the test remains central to the analysis.

Recent cases from our sister states are illuminating. In the State of Washington, the implied consent statute mandates, in a manner very similar to Pennsylvania's statute, that motorists reasonably suspected of DUI are "deemed to have given consent" to chemical testing, but nevertheless provides a statutory right of refusal. *See* WASH. REV. CODE § 46.20.308 (2015). The Washington Supreme Court explained that "Washington's implied consent statute does not authorize a search; instead, it authorizes a choice between two options, to consent or refuse, with penalties attached for refusal." *State v. Baird*, 386 P.3d 239, 246 (Wash. 2016) (plurality). In a thorough discussion of Wisconsin's implied consent statute, which, like Pennsylvania's, provides

that drivers are "deemed to have given consent" to chemical tests in specified circumstances, *see* WIS. STAT. § 343.305(2), the Court of Appeals of Wisconsin offered the following:

> "Implied consent" is not an intuitive or plainly descriptive term with respect to how the implied consent law works. We suspect that it is a source of confusion. On occasion in the past we have seen the term "implied consent" used inappropriately to refer to the consent a driver gives to a blood draw at the time a law enforcement officer requires that driver to decide whether to give consent. However, actual consent to a blood draw is not "implied consent," but rather a possible result of requiring the driver to choose whether to consent under the implied consent law.

> There are two consent issues in play when an officer relies on the implied consent law. The first begins with the "implied consent" to a blood draw that all persons accept as a condition of being licensed to drive a vehicle on Wisconsin public road ways. The existence of this "implied consent" does not mean that police may require a driver to submit to a blood draw. Rather, it means that, in situations specified by the legislature, if a driver chooses not to consent to a blood draw (effectively declining to comply with the implied consent law), the driver may be penalized. This penalty scenario for "refusals" created by the implied consent law sets the scene for the second consent issue.

> The State's power to penalize a refusal via the implied consent law, under circumstances specified by the legislature, gives law enforcement the right to force a driver to make what is for many drivers a difficult choice. The officer offers the following choices: (1) give consent to the blood draw, or (2) refuse the request for a blood draw and suffer the penalty specified in the implied consent law. When this choice is offered under statutorily specified circumstances that pass constitutional muster, choosing the first option is voluntary consent. The fact that the driver is forced to make a difficult choice does not render the consent involuntary.

*State v. Padley*, 849 N.W.2d 867, 876 (Wis. Ct. App. 2014) (paragraph symbols omitted).

In *State v. Butler*, 302 P.3d 609, 613 (Ariz. 2013), the Supreme Court of Arizona noted that, under the state's implied consent law, "the officer is directed to ask the arrestee to submit to the test, and the arrestee may then refuse by declining to

expressly agree to take the test." The Court held that voluntariness of the arrestee's consent at the time of the test is a constitutional necessity. *Id.* (holding that "the Fourth Amendment requires an arrestee's consent to be voluntary to justify a warrantless blood draw"). The Supreme Court of Delaware has held that, rather than operating as a blanket exception to the warrant requirement, "a Fourth Amendment totality of the circumstances analysis applies" in considering the voluntariness of consent under Delaware's implied consent law. *Flonnory v. State*, 109 A.3d 1060, 1062 (Del. 2015). Likewise, in *Williams*, the Supreme Court of Georgia remanded for a determination of whether the defendant gave actual consent to a blood test, "which would require the determination of the voluntariness of the consent under the totality of the circumstances." 771 S.E.2d at 377. Agreeing with the *Williams* Court's assessment of the developing trend in the majority of state courts, the Supreme Court of Nebraska has similarly concluded that voluntary consent to a blood draw must be established by the totality of the circumstances, but the Court noted that the state's implied consent statute is a consideration in that analysis. *See State v. Modlin*, 867 N.W.2d 609, 621 (Neb. 2015) ("[W]hen the State claims the blood draw was proper pursuant to the consent exception to the warrant requirement, actual voluntary consent is to be determined by reference to the totality of the circumstances, one of which is the implied consent statute."). Finding a right to refuse consent under both the implied consent statute and state constitution, the Supreme Court of Hawai'i has held that, "in order to legitimize submission to a warrantless BAC test under the consent exception, consent may not be predetermined by statute, but rather it must be concluded that, under the totality of the circumstances, consent was in fact freely and voluntarily given." *State v. Won*, 372 P.3d 1065, 1080 (Haw. 2015).

In a case sharing factual underpinnings with the instant matter, in that the defendant was unconscious at the time of a blood draw, the California Court of Appeal in *People v. Arredondo*, 199 Cal. Rptr. 3d 563 (Cal. Ct. App. 2016), held that the defendant's unconsciousness rendered him incapable of manifesting voluntary consent to a blood draw, and that statutorily implied consent was insufficient to justify the failure to obtain a warrant.[16]  Stressing the necessity that consent to a search must be given freely and voluntarily, the court highlighted the significant constitutional concerns underlying the notion of implied consent as an independent exception to the warrant requirement.  "We fear the Fourth Amendment could be left in tatters by a rule empowering the state to predicate a search on conduct that does not in fact constitute a manifestation of consent but is merely 'deemed' to do so by legislative fiat."  *Id.* at 577.[17]

---

[16]  Although concluding that the blood draw was unconstitutional, the court in *Arredondo* nevertheless held that the results of the blood test were admissible under California's good-faith exception to the exclusionary rule.  199 Cal. Rptr. 3d at 582.  The Supreme Court of California has granted review in *Arredondo*, but has yet to issue an opinion.  *See People v. Arredondo*, 371 P.3d 240 (Cal. 2016).  We note that Pennsylvania law does not recognize a good-faith exception to the exclusionary rule. *See Commonwealth v. Edmunds*, 586 A.2d 887, 905-06 (Pa. 1991).

[17]  In their responsive opinions, Chief Justice Saylor and Justice Mundy conclude that, pursuant to the implied consent statute, the act of driving constitutionally suffices as consent to a chemical test.  The Chief Justice specifically opines that the operation of a motor vehicle establishes the voluntariness that is essential to the consent exception to the warrant requirement.  *See* Conc. Op. at 2 (Saylor, C.J., concurring) (stating that "the voluntary act of operating a vehicle suffices to establish the initial consent to chemical testing" and that "it can be concluded here that Myers voluntarily consented to testing via his operation of the motor vehicle").  The *Arredondo* court outlined the constitutional perils of proceeding with this reasoning, highlighting the dangers that may arise in other contexts from permitting legislatures to predetermine one's consent to a search based upon a voluntary act of using a public facility or exercising a privilege regulated by the government:

> It is far from implausible, for example, that a legislative body—state or federal—might decree, in the name of public safety or national security, that the use of the mails, or the phone lines, or the Internet—all of which rely to a greater or lesser extent on publicly owned property or facilities or publicly provided services—constitutes consent to search the contents of

(continued…)

From these recent decisions of our sister courts we discern a clear and unmistakable trend toward the recognition that statutorily implied consent alone does not satisfy the consent exception to the warrant requirement, and that chemical tests conducted under such statutes must be analyzed in the same manner as any other search alleged to be justified by the subject's consent, *i.e.*, the consent must be given voluntarily, and voluntariness is evaluated under the totality of the circumstances. *See Schneckloth*, 412 U.S. at 248-49. In accordance with the substantial weight of these authorities, we reject the Commonwealth's contention that the implied consent provision of 75 Pa.C.S. § 1547(a) serves, in and of itself, as an exception to the warrant requirement.

Our implied consent statute is not an *ipso facto* authorization to conduct a chemical test. Rather, it is the statutory mechanism by which a police officer may seek to obtain voluntary consent, unique to this context in that the law prescribes consequences for the failure to provide such consent.[18] The statute contemplates a

_____

(…continued)

> all communications thus conducted. Consent to search homes might be "deemed" to be given by anyone taking advantage of various publicly provided or subsidized privileges—like use of public utilities, libraries, or schools. Consent to search the person might be "deemed" to be given by use of a public sidewalk or occupancy of a public place.

*Arredondo*, 199 Cal. Rptr. 3d at 577-78. As the *Arredondo* court cautioned, to interpret the implied consent statute such that the voluntariness of one's consent to a chemical test is predetermined is to imbue the legislature with the power to curtail substantially the essential protections of the Fourth Amendment.

[18] Justice Mundy notes that "law enforcement does not need legislative authorization to obtain voluntary consent to a search." Dissenting Opinion at 4 n.4. Surely, Justice Mundy is correct in observing that a police officer requires no act of the legislature to request a suspect's consent to a search. However, the ordinary request for consent to a search is not accompanied by a set of legal repercussions that will follow from a refusal. No consequences befall a homeowner who declines a police officer's request for consent to search the home. By contrast, the implied consent scheme imposes a set of consequences upon motorists who refuse to provide consent (continued…)

police officer's *request* that the arrestee submit to chemical testing, and, if the arrestee declines the request, "the testing shall not be conducted." 75 Pa.C.S. § 1547(b)(1). The concept of implied consent does not allow for a chemical test if the arrestee refuses to provide actual consent in response to the police officer's request. If, however, the arrestee complies with the police officer's request, then the arrestee has provided actual consent. Contrary to the Commonwealth's suggestion, the voluntariness of consent at the time of the chemical test remains an essential consideration.

Myers is correct in observing that Pennsylvania's implied consent scheme "does not actually permit the involuntary taking of a blood sample," but, rather, "it penalizes a person for refusing to permit the taking of a sample." Brief for Myers at 12. As true of Pennsylvania's implied consent statute as it was of Wisconsin's, the *Padley* court aptly observed that "the implied consent law is explicitly designed to allow the driver, and not the police officer, to make the choice as to whether the driver will give or decline to give *actual* consent to a blood draw when put to the choice between consent or automatic sanctions [for refusal]." *Padley*, 849 N.W.2d at 879 (emphasis in original). The statute does not authorize police officers to seize bodily fluids without an arrestee's permission. Instead, it imposes an ultimatum upon the arrestee, who must choose either to submit to a requested chemical test or to face the consequences that follow from the refusal to do so.

Were we to interpret Subsection 1547(a) in a manner that would authorize a compelled chemical test without regard to the arrestee's voluntary consent at the time of the test, we effectively would read Subsection 1547(b) out of the statutory scheme and

---

(…continued)
to chemical testing, and those consequences exist only by virtue of the statutory scheme that effectuates them.

jeopardize the constitutionality of the statute as a whole, inasmuch as we would countenance a "consent search" that violates the constitutional requirement that consent be voluntary and a product of one's own free will. To the contrary, under Subsection 1547(b)(1), "there is an absolute right to refuse." *Eisenhart*, 611 A.2d at 682. Under Subsection 1547(b)(2), "[i]t shall be the duty of the police officer" to inform the arrestee of the consequences of refusal. 75 Pa.C.S. § 1547(b)(2). "An arrestee is entitled to this information so that his choice to take a [chemical] test can be knowing and conscious." *O'Connell*, 555 A.2d at 878. The opportunity to make a knowing and conscious choice—to decide whether to provide actual, voluntary consent or to exercise the right of refusal—is essential in every situation in which police officers seek to rely upon the implied consent law instead of upon a search warrant. This conclusion not only is commanded by the statute; it is a constitutional necessity.[19] The statute cannot

---

[19] We recognize that the Supreme Court of the United States once held that the provision of a statutory right to refuse chemical testing "is simply a matter of grace bestowed by the . . . legislature." *South Dakota v. Neville*, 459 U.S. 553, 565 (1983). The *Neville* Court suggested that a state legislature could require blood draws by force, if necessary, and a statute's provision that blood draws may not be conducted forcibly reflects a legislature's preference "to avoid violent confrontations." *Id.* at 559. However, the *Neville* Court was not considering the consent exception to the warrant requirement, nor was it considering the Fourth Amendment at all. Rather, the *Neville* decision addressed whether the introduction of a defendant's refusal to submit to a chemical test as evidence in a DUI prosecution is barred by the Fifth Amendment's privilege against self-incrimination or the fundamental fairness requirement of due process. *See also Wulff*, 337 P.3d at 582 (noting that the *Neville* Court "did not address the appropriateness of implied consent as an exception to the Fourth Amendment's warrant requirement."). Accordingly, *Neville* does not control the analysis here. Further, we agree with the courts of our sister states that the notion of irrevocable implied consent is inconsistent with the requirement of voluntariness that always underlies the consent exception to the warrant requirement. *See, e.g.*, *Byars*, 336 P.3d at 946; *Wulff*, 337 P.3d at 581; *Won*, 372 P.3d at 1079-80; *State v. Fierro*, 853 N.W.2d 235, 241 (S.D. 2014) ("The State's argument that Fierro consented to the compelled, warrantless blood draw without any right to refuse . . . does not fit within the consent exception to the warrant requirement."); *State v. Villarreal*, 475 S.W.3d 784, 805 (Tex. Crim. App. 2014) ("[I]n the context of a nonconsensual, warrantless bodily search . . . a statute providing (continued…)

be interpreted to authorize a search, deemed to operate under the consent exception to the warrant requirement, if the search would not otherwise be justified by that exception. Simply put, statutorily implied consent cannot take the place of voluntary consent.

Although it does not squarely resolve the question of whether implied consent may serve as an independent warrant exception, the *Birchfield* decision does not suggest any contrary conclusion. To be sure, *Birchfield* (like our own precedents) provides a general if uncontroversial endorsement of the concept of implied consent. The Court noted that its "prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply." *Birchfield*, 136 S.Ct. at 2185. But *Birchfield* in no way suggests that the existence of a statutory implied consent provision obviates the constitutional necessity that consent to a search must be voluntarily given, "and not the result of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 248. In conjunction with its reliance upon *Schneckloth*, the Supreme Court's holding, "that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense," *Birchfield*, 136 S.Ct. at 2186, appears to be premised upon the coercive effect of the threat of criminal punishment, inasmuch as such coercion may render one's consent involuntary. Indeed, the Commonwealth presently argues that the gravamen of the *Birchfield* Court's reasoning was concern for the inherent coercion that follows from the threat of criminal prosecution. *See* Reply Brief for Commonwealth at 2-3 (arguing that *Birchfield* "disapproved only of blood tests

_____

(…continued)
for irrevocable implied consent cannot supply the type of voluntary consent necessary to establish an exception to the Fourth Amendment warrant requirement.").

obtained through coercion, and held statutes that coerce consent by 'pain of committing a criminal offense' are to that extent invalid") (quoting *Birchfield*, 136 S.Ct. at 2186).

The *Birchfield* Court's application of its holding further supports the conclusion that, despite the existence of an implied consent provision, an individual must give actual, voluntary consent at the time that testing is requested. One of the petitioners before the *Birchfield* Court, Steve Michael Beylund, submitted to a blood draw after being provided implied consent warnings that, in light of the Court's decision, failed to pass constitutional muster. Considering the facts of Beylund's case, the Court explained that, "[b]ecause voluntariness of consent to a search must be 'determined from the totality of all the circumstances,' *Schneckloth*, [412 U.S. at 227], we leave it to the state court on remand to reevaluate Beylund's consent." *Birchfield*, 136 S.Ct. at 2186. The clear lesson is that the requirement of voluntariness remains in full force despite the existence of a statutory implied consent provision.

Of particular salience for today's case, the *Birchfield* Court addressed the circumstance in which a DUI suspect is unconscious when a chemical test is sought. The Court explained:

> It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is needed to take a breath test due to profound intoxication or injuries. But we have no reason to believe that such situations are common in drunk-driving arrests, and when they arise, the police may apply for a warrant if need be.

*Id.* at 2184-85. Lest anyone doubt what the Supreme Court meant when it stated that police officers in such circumstances "may apply for a warrant if need be," the Court emphasized that "[n]othing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances exception to the warrant requirement when there is not." *Id.*

at 2184.  Noting that all fifty states have enacted implied consent laws, *id.* at 2169, the Court nowhere gave approval to any suggestion that a warrantless blood draw may be conducted upon an unconscious motorist simply because such a motorist has provided deemed consent by operation of a statutory implied consent provision.  Rather, the Supreme Court indicated that a warrant would be required in such situations unless a warrantless search is necessitated by the presence of a true exigency.

Furthermore, although the viability of implied consent as an independent warrant exception was not directly at issue in *McNeely*, in which the United States Supreme Court addressed the exigent circumstances exception, some courts have found resonance in the Supreme Court's treatment of another case in light of *McNeely*, to wit, *Aviles v. State*, 385 S.W.3d 110 (Tex. App. 2012), *cert. granted, judgment vacated*, 134 S.Ct. 902 (2014).  Without any discussion of the exigent circumstances exception at issue in *McNeely*, the *Aviles* court determined that Texas' implied consent scheme authorized a mandatory blood draw "without express consent and without a warrant," *id.* at 116, and that such a blood draw did not violate the Fourth Amendment.  After issuing its decision in *McNeely*, the Supreme Court granted *certiorari* in *Aviles*, reversed the Texas court's decision, and remanded for further consideration in light of *McNeely*.  *See Aviles v. Texas*, 134 S.Ct. 902 (2014).  Because, read broadly, the Supreme Court's holding in *McNeely* that, "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances[,]" 133 S.Ct. at 1563, could be interpreted as precluding all *per se* exceptions to the warrant requirement in this context, and because the Court's remand of *Aviles* for reconsideration in light of *McNeely* cannot be reconciled if that holding has no relevance to implied consent statutes, some courts have concluded that *McNeely* casts doubt upon the viability of implied consent as an exception to the warrant

requirement, absent a finding of voluntary consent under the totality of the circumstances. *See*, *e.g.*, *Wulff*, 337 P.3d at 581 (opining that remand in *Aviles* "must indicate that *McNeely*'s holding includes examining the totality of the circumstances in all cases where an officer orders a forced warrantless blood draw[,]" and suggesting that the Supreme Court "rejected [Texas'] implied consent statute as a *per se* exception to the Fourth Amendment."); *Byars*, 336 P.3d at 946 (remand in *Aviles* "undermines support for the conclusion that consent alone is a viable justification for a warrantless search where the subject of the search does not have the option to revoke consent.").[20]

Following the Supreme Court's remand of *Aviles* for reconsideration in light of *McNeely*, the Texas court concluded that, because the challenged statutes "do not take into account the totality of the circumstances present in each case, but only consider certain facts, an approach rejected in *McNeely*, the statutes were not substitutes for a warrant or legal exceptions to the Fourth Amendment warrant requirement." *Aviles v. State*, 443 S.W.3d 291, 294 (Tex. App. 2014) (citation and internal quotation marks omitted). Professor Wayne R. LaFave has noted, citing, *inter alia*, *Flonnory*, *Byars*, and *Fierro*, that "[o]ther courts have reached the same conclusion, and rightly so, as a rule to the contrary would in effect nullify the Supreme Court's decision in *McNeely*. Nothing in the more recent *Birchfield* decision casts any doubt upon that conclusion." 2 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 3.10(b) (4th ed.) (footnote omitted).

We would not go so far as to conclude that any particular ruling upon the viability of implied consent as a warrant exception necessarily would "nullify" *McNeely*, inasmuch as that decision may be read narrowly to apply only to the exigent circumstances exception. However, we do agree with Professor LaFave that *Birchfield*

---

[20]     *Cf. Won*, 332 P.3d at 682 n.28 ("[W]e decline to read the Court's action in *Aviles* as a decision addressing the merits of implied consent statutes[.]").

does not cast doubt upon the principle that the consent exception to the warrant requirement requires analysis under the totality of the circumstances, and may not be satisfied merely by legislative proclamation. Although the *Birchfield* decision does not state expressly whether implied consent, standing alone, may obviate the warrant requirement as a general matter, we find support in that decision for the continued application of the well-established principle that consent to a search must be provided voluntarily under the totality of the circumstances. We find it particularly doubtful that the Court, while relying upon the seminal *Schneckloth* decision in discussing the necessity of voluntariness, would sweep away decades of jurisprudence by implication only, and would alter dramatically the mechanics of the consent exception without explicitly so declaring.

In a future case, *Birchfield* may impact the constitutional validity of certain provisions of Pennsylvania's implied consent scheme. But the instant case presents no facial constitutional challenge to any statutory provision. Accordingly, we do not today consider the effect of the *Birchfield* decision upon our statutes. Rather, we consider *Birchfield* only as it relates to our conclusion that, in the absence of actual, voluntary consent, statutorily implied consent does not dispense with the need for police to obtain a warrant before conducting a chemical test of a DUI arrestee's blood.

In light of the foregoing, we conclude that the language of 75 Pa.C.S. § 1547(a) providing that a DUI suspect "shall be deemed to have given consent" to a chemical test does not constitute an independent exception to the warrant requirement of the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. Like any other search premised upon the subject's consent, a chemical test conducted under the implied consent statute is exempt from the warrant requirement only if consent is given voluntarily under the totality of the circumstances.

To the extent that any statement in *Kohl* or *Riedel* suggests otherwise, we disapprove of such expression.

Consistent with our understanding of the statute in *O'Connell*, 555 A.2d at 877, we conclude that a DUI arrestee must be provided with an opportunity to make a "knowing and conscious choice" between providing voluntary consent to a chemical test or accepting the consequences that will follow from the refusal to do so. Implied consent, standing alone, does not satisfy the constitutional requirements for the searches that the statute contemplates. If neither voluntary consent nor some other valid exception to the warrant requirement is established, then a chemical test may be conducted only pursuant to a search warrant.

### D. Myers did not provide voluntary consent to the blood draw.

It is undisputed that Myers was under arrest for suspicion of DUI when he was transported to the hospital. As an arrestee, Myers possessed an express statutory right to refuse chemical testing. *See* 75 Pa.C.S. § 1547(b)(1); *Eisenhart*, 611 A.2d at 683. The opportunity to choose whether to exercise this right or to provide actual consent to the blood draw was necessary to the establishment of Myers' voluntary consent. Because Myers was pharmacologically rendered unconscious by medical personnel prior to the time that Officer Domenic read *O'Connell* warnings to his unresponsive arrestee, no credible assertion can be made that Myers was provided with the opportunity to make a "knowing and conscious choice" regarding whether to undergo chemical testing or to exercise his right of refusal. *O'Connell*, 555 A.2d at 877. Indeed, Officer Domenic's decision to read *O'Connell* warnings and to request a response from an unconscious and supine patient represents the antithesis of an opportunity to make a knowing and conscious choice. Because Myers was deprived of this choice, the totality

of the circumstances unquestionably demonstrates that he did not voluntarily consent to the blood draw.[21]

## III. Conclusion

Because Officer Domenic failed to satisfy the requirements of the implied consent statute, so as to establish Myers' voluntary consent, the Commonwealth cannot demonstrate that the blood draw was justified by the consent exception to the warrant requirement. Furthermore, the Commonwealth did not seek to demonstrate that exigent circumstances dispensed with the need to obtain a warrant, or that the blood draw was justified by any other exception to the warrant requirement. Therefore, no warrant was obtained, and no exception to the warrant requirement applied. Accordingly, the blood

---

[21] Because we conclude that the deprivation of the opportunity to make a knowing and conscious choice is dispositive of whether voluntary consent was present, we need not resolve the parties' differing contentions as to whether Myers may be deemed to have "refused" due to his unconscious state. Myers equates unconsciousness with silence, which the Commonwealth Court has held constitutes a refusal and triggers the penalty of license suspension. *See* Brief for Myers at 12 (citing *Broadbelt v. Pa. Dep't of Transp., Bureau of Driver Licensing*, 903 A.2d 636 (Pa. Cmwlth. 2006)); *see also Grogg v. Pa. Dep't of Transp., Bureau of Driver Licensing*, 79 A.3d 715, 719-20 (Pa. Cmwlth. 2013). Such a conclusion is premised upon this Court's definition of "refusal" set forth in *Pennsylvania Department of Transportation v. Renwick*, 669 A.2d 934, 939 (Pa. 1996), wherein we held that "anything less than an unqualified, unequivocal assent constitutes a refusal under § 1547." *See also Nardone v. Pa. Dep't of Transp., Bureau of Driver Licensing*, 130 A.3d 738, 748-50 (Pa. 2015); *Todd v. Pa. Dep't of Transp., Bureau of Driver Licensing*, 723 A.2d 655, 658 (Pa. 1999). The Commonwealth, by contrast, relies upon this Court's statement in *Eisenhart* that "testing is allowed absent an affirmative showing of the subject's refusal to consent to the test at the time that the testing is administered." Brief for Commonwealth at 18 (quoting *Eisenhart*, 611 A.2d at 683). We note that this formulation in *Eisenhart* is untenable in light of today's holding. *See* Part II.B, *supra*. However, we offer no opinion regarding whether Myers may be deemed to have "refused" so as to sustain a driver's license suspension under the *Renwick* standard, as such a determination lies beyond the scope of this decision. Rather, we conclude that, in the present context of suppression in a criminal prosecution, Myers was unable to manifest either assent or refusal due to his unconscious state, and he therefore did not provide the voluntary consent that is necessary to establish the consent exception to the warrant requirement.

sample was obtained in violation of Myers' right to be free from unreasonable searches and seizures, and the results of a derivative blood test correctly were suppressed.

The order of the Superior Court is affirmed.

Justices Donohue and Dougherty join the opinion.

Chief Justice Saylor files a concurring opinion in which Justice Baer joins in full and in which Justice Donohue joins Part II.

Justice Todd joins Parts I, II(A), II(B), II(D) and the mandate of the opinion and files a concurring opinion.

Justice Mundy files a dissenting opinion.