J-S27020-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| PAUL FRED KIGER | : | |
| | : | |
| Appellant | : | No. 1423 WDA 2018 |

Appeal from the Judgment of Sentence Entered August 29, 2018
In the Court of Common Pleas of Greene County
Criminal Division at No(s): CP-30-CR-0000293-2017

BEFORE: OLSON, J., OTT, J., and COLINS*, J.

MEMORANDUM BY OTT, J.:            **FILED OCTOBER 24, 2019**

Paul Fred Kiger appeals from the judgment of sentence imposed August 29, 2018,[1] in the Greene County Court of Common Pleas. Prior to sentencing, the court, sitting as fact-finder, convicted Kiger of driving under the influence of alcohol ("DUI") (general impairment/incapable of driving safely; second offense) and DUI (highest rate of alcohol).[2] The court sentenced Kiger to a term of 72 hours to 6 months' incarceration. On appeal, Kiger claims the court erred in failing to grant his motion to suppress his blood test results based on

_____

* Retired Senior Judge assigned to the Superior Court.

[1] Kiger's sentence was filed the following day.

[2] **See** 75 Pa.C.S. §§ 3802(a)(1) and (c), respectively.

failure to obtain a warrant. **See** Kiger's Brief at 4. For the reasons below, we affirm the judgment of sentence.

The facts[3] and procedural history are as follows. On June 20, 2017, between the hours of 10:00 p.m. and 11:00 p.m., Trooper Lucas Borkowski, Pennsylvania State Police, was on routine patrol when he exited Interstate 79 at the Ruff Creek Exit, and then made a right-hand turn onto Route 221, which is a two-lane highway. At this point, Trooper Borkowski encountered Kiger's vehicle, a 2003 Buick Lesabre, stopped in the southbound, right-hand lane for approximately 20 seconds. Believing the occupants[4] in the car may have had a minor issue, Trooper Borkowski did not conduct a traffic stop. The trooper observed Kiger's vehicle continue down Route 221, turn right on Greene Valley Road, travel approximately 100 yards, and then stop again in the travel lane. Based on the traffic violations and concern for those individuals in the car, the trooper activated his emergency lights and conducted a traffic stop.

Trooper Borkowski spoke with Kiger and noticed Kiger's eyes were glassy and bloodshot, and there was a strong order of alcohol emanating from the vehicle. Kiger's speech was slow and slurred. The trooper asked Kiger why he stopped in the middle of the road on two occasions, and Kiger replied

_____

[3] The factual history was summarized based on the testimony taken at the April 9, 2018, suppression hearing and the August 29, 2018, non-jury trial.

[4] There was a female passenger, who was subsequently identified as Kiger's girlfriend.

that he was trying to locate a restroom. The trooper also inquired if Kiger had been drinking, to which Kiger replied in the affirmative. Because he was alone, the trooper did not conduct a complete set of standardized field sobriety tests. Trooper Borkowski then placed Kiger under arrest for suspicion of DUI, and transported him to the state police barracks in Waynesburg, Pennsylvania.

At the barracks, Trooper Borkowski advised Kiger of his implied consent rights and read a DL-26 form that pertained to a breath test. With respect to the breath-related DL-26 form, "those warnings would have included the admonishment that refusal would not only result in a license suspension, but also would result in a presumption of the highest level of blood alcohol." Order, 4/9/2018, at unnumbered 3. Kiger did not refuse to submit to the breath test, but he was physically unable to perform the breath test.

Trooper Borkowski then asked Kiger to submit to a blood test. The trooper indicated Kiger was "completely cooperative" with agreeing to the test. N.T., 4/9/2018, at 11. The trooper advised Kiger that the blood draw was voluntary, he could not be forced to submit to it, he did not have the right to speak with an attorney when deciding whether to submit, and that he would only have his license suspended and have to pay a restoration fee if he refused. Kiger consented to the blood draw, and the test revealed he had a blood alcohol content ("BAC") of 0.206%. *See id.* at 27.

Kiger was charged with two counts of DUI, one count of careless driving, and one count of stops and park at an intersection. He filed a motion to

suppress on February 5, 2018, alleging his consent had been involuntary and the results were obtained in violation of his rights pursuant to ***Birchfield v. North Dakota***, 136 S.Ct. 2160 (U.S. 2016). A suppression hearing was held on April 9, 2018. One day later, the trial court entered an order, denying Kiger's suppression motion. Kiger then filed a motion for reconsideration of the court's decision on April 16, 2018. The court granted the motion to hear further argument on the matter. A hearing was subsequently held on May 29, 2018. Two days later, the court denied Kiger's motion for reconsideration, stating it remained "convinced that [Kiger] consented to the draw of blood[.]" Order, 5/31/2018. The matter proceeded to a non-jury trial on August 29, 2018. At the conclusion of the trial, the court convicted Kiger of two counts of DUI, and found him not guilty of careless driving and stops and park at an intersection. The court immediately sentenced Kiger to a term of 72 hours to six months' incarceration for the DUI (highest rate of alcohol) count. The remaining DUI offense merged for sentencing purposes. Kiger did not file post-sentence motions, but did file this timely appeal.[5]

In his sole issue on appeal, Kiger complains:

[The trial court] err[ed] in finding that no warrant to take the blood of the driver suspected of driving under the influence of alcohol was required where the police warned the driver of an enhanced penalty if he refused to take a breath test which … the

_____

[5] On October 2, 2018, the trial court ordered Kiger to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Kiger filed a concise statement on October 19, 2018. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on November 2, 2018.

driver could not complete due to his physical condition and then [was] taken to the hospital for a blood draw[.]

Kiger's Brief at 16. Moreover, he states:

Once a Trooper tells a person arrested for driving under the influence of alcohol, and that person understands that a refusal to take a chemical test will result in an enhanced penalty, it cannot be erased from memory. When the Trooper cannot complete the breath test, if the person is taken to the hospital, there should, at least, in the absence of a search warrant, be a knowing consent to the blood test. The driver did not know the officer would have to obtain a search warrant. The driver was not given an explanation of the difference in the reading of the forms. There was no effort on the part of the arresting officer to correct the understanding that the absence of enhanced penalty language does not mean the penalty to this driver would be less. The mere boiler plate reading of the two inconsistent DL-26 forms in a "contract of adhesion-like" situation while under arrest and detained for chemical test is not sufficient to remove from the motorist's mind the first admonishment that a refusal may result in an enhancement of his penalty.

*Id.* at 21-22. Additionally, he contends:

The driver here submits that the court did not determine whether or not the consent was voluntary or compelled by the threat of an enhanced penalty and the expectation that giving the blood test yielded a lesser penalty.

There is nothing in any of the forms read to advise the motorist that higher criminal penalties cannot be imposed for refusal of the blood test to correct what had been stated as to the other chemical test that his lung capacity prevented him from taking. The trooper did not tell him. There was nothing at the hospital that erased the warning first given to the motorist at the police station.

*Id.* at 24-25.

Our standard of review regarding suppression challenges is well-settled:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the

suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the [trial court's] conclusions of law [] are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

*Commonwealth v. Shreffler*, 201 A.3d 757, 763 (Pa. Super. 2018) (internal citation omitted).

Additionally, we are guided by the following: Both the "Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures." *Commonwealth v. Evans*, 153 A.3d 323, 327 (Pa. Super. 2016), *quoting* *Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa. Super. 2012), *appeal denied*, 65 A.3d 413 (Pa. 2013). "The administration of a blood test, performed by an agent of, or at the direction of the government, constitutes a search under both the United States and Pennsylvania Constitutions." *Evans*, 153 A.3d at 327-328, *quoting* *Commonwealth v. Kohl*, 615 A.2d 308, 315 (Pa. 1992). "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an

established exception applies." ***Commonwealth v. Strickler***, 757 A.2d 884, 888 (Pa. 2000). "One such exception is consent, voluntarily given." ***Id.*** at 888-889 (citation omitted).

> [A panel of this Court] set forth fundamental law with regard to warrantless blood draws and consent as follows:
>
>> In ***Birchfield*** [***v. North Dakota***, __ U.S. __, 136 S.Ct. 2160 (2016)], the Supreme Court of the United States held that criminal penalties imposed on individuals who refuse to submit to a warrantless blood test violate the Fourth Amendment (as incorporated into the Fourteenth Amendment). Within one week of that decision, [the Pennsylvania Department of Transportation] revised the [standard consent form used by police, known as the] DL-26 form[,] to remove the warnings mandated by 75 Pa.C.S.A. § 3804 that theretofore informed individuals suspected of DUI that they would face enhanced criminal penalties if they refused to submit to a blood test in order to comply with ***Birchfield***. [The] revised form [is] known as Form DL-26B[.]
>>
>> ***
>>
>> This Court subsequently held that [] enhanced criminal penalties [imposed] for failure to consent to a blood draw constituted an illegal sentence because of ***Birchfield***. ***See Commonwealth v. Giron***, 2017 PA Super 23, 155 A.3d 635, 639 (Pa. Super. 2017).
>>
>> On July 20, 2017, Governor Thomas W. Wolf signed into law Act 30 of 2017, which amended 75 Pa.C.S.A. § 3804 to comport with ***Birchfield***. Specifically, Act 30 provides for enhanced criminal penalties for individuals who refuse to submit to blood tests only when police have obtained a search warrant for the suspect's blood. ***See*** 75 Pa.C.S.A. § 3804(c). Hence, from July 20, 2017 onwards the DL-26B form conforms to the revised statutory law.
>
> ***Commonwealth v. Venable***, 2018 PA Super 329, 200 A.3d 490, 495 (Pa. Super. 2018) (original brackets omitted).

*Commonwealth v. Krenzel*, 209 A.3d 1024, 1028 (Pa. Super. 2019).

In analyzing whether consent is voluntary, we note:

In determining the validity of a given consent, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. Such evaluation includes an objective examination of the maturity, sophistication and mental or emotional state of the defendant. Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation.

While there is no hard and fast list of factors evincing voluntariness, some considerations include: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.

*Venable*, 200 A.3d at 497 (citations omitted).

Furthermore, 75 Pa.C.S. § 1547 is relevant to our analysis, which states, in pertinent part:

**(a)** *General rule*.--Any person who drives, operates or is in actual physical control of the movement of a vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a vehicle in violation of section [...] (relating to driving under influence of alcohol or controlled substance)[.]

**(b)** *Civil penalties for refusal*.

(1)   If any person placed under arrest for a violation of section 3802 is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person[.]

* * *

(2)   It shall be the duty of the police officer to inform the person that:

(i) the person's operating privilege will be suspended upon refusal to submit to chemical testing and the person will be subject to a restoration fee of up to $2,000; and

(ii) if the person refuses to submit to chemical breath testing, upon conviction or plea for violating section 3802(a)(1), the person will be subject to the penalties provided in section 3804(c) (relating to penalties).

75 Pa.C.S. § 1547 (emphasis in original).  Moreover,

[o]ur Supreme Court examined Section 1547 in **Commonwealth v. Myers**, 640 Pa. 653, 164 A.3d 1162 (Pa. 2017), a case wherein the defendant who was arrested on suspected DUI charges was unconscious in the hospital when a police officer read him consent forms and then directed hospital personnel to conduct a blood draw.  The **Myers** Court determined:

[O]nce a police officer establishes reasonable grounds to suspect that a motorist has committed a DUI offense, that motorist "shall be deemed to have given consent to one or more chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance."   75 Pa.C.S.A. § 1547(a). Notwithstanding this provision, Subsection 1547(b)(1) confers upon all individuals under arrest for DUI an explicit statutory right to refuse chemical testing, the invocation of which triggers specified consequences.  **See** 75 Pa.C.S.A. § 1547(b)(1) ("If any person placed under arrest for DUI is

- 9 -

requested to submit to chemical testing and refuses to do so, the testing shall not be conducted[.]").

Under this statutory scheme, a motorist placed under arrest for DUI has a critical decision to make. The arrestee may submit to a chemical test and provide the police with evidence that may be used in a subsequent criminal prosecution, or the arrestee may invoke the statutory right to refuse testing, which: (i) results in a mandatory driver's license suspension under 75 Pa.C.S.A. § 1547(b)(1); (ii) renders the fact of refusal admissible as evidence in a subsequent DUI prosecution pursuant to 75 Pa.C.S.A. § 1547(e); and (iii) authorizes heightened criminal penalties under 75 Pa.C.S.A. § 3804(c) if the arrestee later is convicted of DUI. In very certain terms, [the Supreme] Court has held that, in requesting a chemical test, the police officer must inform the arrestee of the consequences of refusal and notify the arrestee that there is no right to consult with an attorney before making a decision. *See* [*Com., Dept. of Transp., Bureau of Traffic Safety v.*] *O'Connell*, 521 Pa. 242, 555 A.2d [873,] 877-878 (Pa. 1989). "An arrestee is entitled to this information so that his choice to take a chemical test can be knowing and conscious." *Id.* at 878. The choice belongs to the arrestee, not the police officer.

*Myers*, 164 A.3d at 1170-1171 (some case citations, original brackets, and footnote omitted) (emphasis added). The *Myers* Court further noted that 75 Pa.C.S.A. § 1547 expressly "states that, '[i]t shall be the duty of the police officer' to inform the arrestee of the consequences of refusal." *Id.* at 1175 n.12, *citing* 75 Pa.C.S.A. § 1547(b)(2). Our Supreme Court held that "[t]his unambiguous statutory command leaves no doubt regarding the obligations of the police officer requesting the arrestee's submission to a chemical test." *Id.* (citation omitted).

*Krenzel*, 209 A.3d 1024, 1030-31 (Pa. Super. 2019). Lastly, this Court has previously rejected claims asserting that "awareness of pre-*Birchfield* enhanced criminal penalties for refusing a blood draw render[s a] blood draw involuntary[,]" having opined as follows:

- 10 -

[I]t is not necessary that the police completely review changes in the law, from the time of a motorist's previous arrest or DUI-related schooling until the motorist's next traffic stop. [An appellant's] ignorance of the most recent Supreme Court decisional law did not impose upon the police [] an affirmative duty to provide [him] with an update on criminal procedure prior to requesting a blood-draw. Neither our state nor the federal constitution compels our police officers to serve as road-side law professors.

Given the foregoing, [an appellant's] personal failure to realize that the Supreme Court's issuance of **Birchfield** struck down § 3804(c)'s enhanced criminal penalties is irrelevant. [...Believing] that our Commonwealth's enhanced penalties remained in full force and effect [... was a m]isconception [] predicated upon a fundamentally flawed view of our federalism.

**Venable**, 200 A.3d at 496-497, *quoting* **Commonwealth v. Johnson**, 188 A.3d 486, 491 (Pa. Super. 2018) (finding defendant's ignorance of the law did not render her consent involuntary). **See also Krenzel**, 209 A.3d at 1029.

Here, the court concisely found the following:

Mr. Kiger was fully cooperative with the Pennsylvania State Police. He consented to a breath sample and was unable to perform that test. He continued to cooperate and the facts establish that his consent to the draw of blood was not a product of coercion, and considering the totality of the circumstances the Court determined the consent to the draw of blood to be voluntarily and freely given.

Trial Court Opinion, 11/2/2018, at 9-10.

We agree with the court's conclusion. Trooper Borkowski utilized DL-26 forms that accurately reflected the current law in accordance with **Birchfield** and this Commonwealth's progeny. As the trooper pointed out, he presented Kiger with two different DL-26 forms – one for breath and one for blood. **See**

- 11 -

N.T., 4/9/2018, at 10, 22.[6]  First, he read Kiger the breath-specific form at the police barracks, which contained a warning of enhanced penalties.  *Id.* at 10, 22.  When Kiger could not complete the breath test for physiological reasons, the trooper then transported him to the hospital to complete the blood test.  *Id.* at 10.  After arriving at the hospital, Trooper Borkowski stated he then read the blood-specific DL-26 form to Kiger.  *Id.* at 10.  The trooper advised Kiger that he could not be forced to submit to the blood test, he does not have the right to an attorney, and there were civil penalties for refusing, namely, a license suspension and a restoration fee.  *Id.* at 12, 24.  The trooper indicated he was aware of the ramifications of *Birchfield*,[7] and did not discuss any enhanced criminal penalties for refusal to consent to a blood test with Kiger because as noted above, *Birchfield* declared such enhancements unconstitutional.  *See Commonwealth v. Smith*, 177 A.3d 915, 921 (Pa. Super. 2017) (restating *Birchfield* "prohibited states from imposing criminal penalties upon an individual's refusal to submit to a warrantless blood test.").

_____

[6]  We note the DL-26 forms were not admitted into evidence at the time of the suppression hearing.  Nevertheless, the trial court found the trooper provided Kiger with the proper warnings.  *See* Order, 4/9/2018, at 8.

[7]  N.T., 4/9/2018, at 12, 21-22.

Kiger consented to both tests and was "cooperative the entire time." *Id.* at 11-12, 28.[8]

Furthermore, to the extent Kiger alleges that he did not know the trooper would have to obtain a warrant if Kiger did refuse and he was not given an explanation of the difference in the substance of the forms, we find his argument fails for several reasons. First, in accordance with *Johnson* and *Venable*, Kiger's "ignorance of the most recent Supreme Court decisional law" did not impose an affirmative duty on Trooper Borkowski to provide Kiger "with an update on criminal procedure prior to requesting a blood-draw." *Venable*, 200 A.3d at 497. Accordingly, the trooper did not have to inform Kiger about the warrant requirement if he chose to refuse the blood test.

Second, as noted above, "the standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent." *Venable*, 200 A.3d at 497. We find that based on the totality of the circumstances, a reasonable person in Kiger's position would understand the content on the two DL-26 forms, given that the trooper read the appropriate form prior to each test, each form described

---

[8] Kiger testified and agreed that he was cooperative with the trooper's request for a blood test, stating, "I figured it'd be less of a penalty if I cooperated and gave him the test[.]" N.T., 4/9/2018, at 41. It also merits mention that while Kiger did not sign the forms, Officer Borkowski testified that a defendant's signature is only necessary for "refusal purposes." *Id.* at 23.

different consequences based upon refusal, and there was a passage of time between the two tests when Kiger was transported from the police barracks to the hospital.

Based on our review of the record in the present case, we conclude that the totality of the circumstances, clearly weigh in favor of finding that Kiger provided knowing and voluntary consent to the blood draw. Kiger presents no compelling case law to support his argument regarding Trooper Borkowski's instructions with regard to the two DL-26 forms. Additionally, Kiger fails to present any evidence to suggest that the trooper's recitation of the DL-26 forms was coercive, deceitful or misrepresentative. **See Venable**, 200 A.3d at 497. Notably, counsel for Kiger did not object to the forms at the time of the suppression hearing. Kiger agreed to submit to the test and underwent the blood draw. Therefore, we conclude no reasonable fact-finder could determine his consent was involuntary. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/24/2019

- 14 -