J-A28021-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| NICHOLAS BRANDON GUMP | : | No. 524 WDA 2020 |

Appeal from the Order Entered March 26, 2020
In the Court of Common Pleas of Greene County Criminal Division at
No(s): CP-30-CR-0000170-2019

BEFORE: OLSON, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY MURRAY, J.: **FILED: April 16, 2021**

The Commonwealth of Pennsylvania (Commonwealth) appeals from the order granting the suppression motion of Nicholas Brandon Gump (Gump).[1] For the reasons that follow, we reverse and remand.

The trial court recounted the evidence presented at the suppression hearing along with its findings as follows:

> The [court] heard the testimony of David Bates, a Cumberland Township Police Officer and the testimony of [Gump]. Their sworn testimony is largely in agreement. Certain facts are not in dispute. However, pursuant to the rules of Criminal Procedure, the [c]ourt will now make the following determination of facts:
>
> We now determine as factual, that on the 6th of November 2018, [Gump] was operating a silver Monte Carlo automobile and that he then collided into the rear of a silver Jaguar operated by

---

[1] The Commonwealth certified its right to appeal because the grant of suppression will terminate or substantially handicap the prosecution. Pa.R.A.P. 311(d).

Christine Lewis. This occurred in Cumberland Township at the intersection of Route 88 and Nemacolin Road, an area known to the [c]ourt.

It would appear that Ms. Lewis' vehicle was stopped at the intersection and attempting to make a left hand turn on Nemacolin Road. [Gump] testified and the [c]ourt believes factually that [Gump's] attention was not fully on the road and that an accident occurred that was the fault of [Gump]. Officer Bates was dispatched to the scene of the accident and he arrived along with Officer [Tony] Gismondi, each in separate vehicles and they arrived at the scene of the accident at 5:42 P.M.

The [c]ourt will note that ultimately there were a total of three (3) police vehicles, a constable vehicle and an ambulance that were all at the scene of the accident. We also note that [Gump's] son was traveling behind [him] and was a witness to the accident although we did not hear his testimony this date. We note that the husband of the driver of the Jaguar is a local and active constable well known to the [c]ourt and well known in the community.

The [c]ourt now determines that [Gump] was a licensed driver and fully cooperative. Although in the initial conversation [during which Gump indicated he had taken prescription medication but no illegal drugs], we do note and now determine as factual, that [Gump] was nervous and that during the development of the accident investigation, we do believe and now determine as factual that Bates observed behavior of [Gump] which changed from the initial observation, such that [he] was jittery and had abnormally constricted pupils. [Based upon these observations, Officer Bates, although not placing Gump under arrest, asked him to sign a voluntary permission to search form for a blood draw].

Although we have indicated that there were a number of emergency vehicles, the [c]ourt does not believe that the environment was particularly coercive. It appears that [Officer] Bates and [Gump] had continuing and normal conversation consistent with a two-vehicle accident in which one or both of the vehicles were inoperable.

The [c]ourt determines that [Gump] was not in custody of the police until he was placed into the police car for transport to Uniontown Hospital, located approximately fifteen miles from the

scene of the accident. This distance was not testified to and is to some extent an estimate by the [c]ourt.

We do also determine as factual, that blood was drawn at the Uniontown Hospital at 6:35 P.M. and the police officers departed Uniontown Hospital located in Fayette County at 6:48 P.M.

We determine as factual that no *Miranda*[2] warnings were read to [Gump] and that no DL-26[B] warnings were ever read to [Gump]. The Court is aware of the precedent as established in *Birchfield*[3] and also, we recognize that this was a draw of blood and not a request for breath. We also note that no search warrant was requested or issued for the draw of blood and recognize instead that the [C]ommonwealth asserts that the draw of blood was obtained by consent.

The [c]ourt has reviewed Commonwealth Exhibit 1 which is a form used by Cumberland Township Police Department which a review illustrates is not particularly well suited to the request for a draw of blood.[4] However, the Court believes that it is to be considered

_____

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] *Birchfield v. North Dakota*, 136 S.Ct. 2160 (2016).

[4] The form states:

CUMBERLAND TWP POLICE DEPT

Permission to Search

I, Nicholas Gump, have been informed by Officer Bates and Officer Gismondi who have made proper identification as (an) authorized law enforcement officers of the Cumberland Township Police Department, of my CONSTITUTIONAL RIGHT not to have a search made of the premises and properly owned by me and/or under my care, custody and control, without a search warrant Knowing of my lawful right to refuse to consent to such a search, I willingly give my permission to the above named officers to conduct a complete search of the premises and for property, Including all the buildings and vehicles, both inside and outside the property located at:

in the totality of the circumstances as to whether [Gump] consented to this blood draw. It should be noted that the [c]ourt does recognize that questions were asked of [Gump] prior to him being transported to the Fayette County Hospital. However, the [c]ourt now determines that questioning was not particularly coercive, nor were they custodial in nature.

The [c]ourt has also admitted, in the context of this hearing. Defense Exhibits A and B. Exhibit B [is] the purported results from NMS Laboratory of the analysis of [Gump's] blood. Exhibit A is the analysis requisition made by the police officer Mr. Bates.

The issues, which the [c]ourt now considers to be before it are whether the draw of blood was consensual and if consensual, whether the search pursuant to the consent exceeded the scope of the consent to search. In the event that the [c]ourt determines that [Gump's] consent was voluntary, a fair reading of the evidence before the [c]ourt would suggest that Officer Bates sought only prescription level medications.

Trial Court Order, 9/20/19, at unnumbered 1-4.

More than two months after the accident, on January 23, 2019, Officer

Bates filed a criminal complaint charging Gump with one count each of driving

---

Blood Draw RG: Prescription Levels

The above officers further have my permission to take from my premises and property, any letters, papers, materials, electronic multimedia and/or storage devices, or any other property which they desire as evidence for criminal prosecution in the case or cases under investigation.

This written permission to search without a search warrant is given by me to the above officers voluntarily and without any threats or promises . . .

Gump and Officers Bates and Gismondi signed the form.

under the influence of drugs (DUI) and careless driving.[5] A summons was issued to Gump the following day. On July 31, 2019, Gump filed a motion to suppress both the statements he made to the officers and the results of the blood draw. On August 30, 2019, the Commonwealth sought leave to amend the criminal information to file additional DUI charges,[6] which the trial court granted on September 20, 2019.

The suppression hearing was held on September 20, 2019. At the end of the hearing, the trial court verbally issued its decision which was transcribed as the order quoted above. On November 13, 2019, the trial court issued a second order denying Gump's motion to suppress. The court found Gump voluntarily consented to the blood draw and the scope of the search was not limited to prescription drugs. Trial Court Order, 11/13/19, at unnumbered 2-5.

A non-jury trial began February 19, 2020, but was adjourned for briefing on whether the trial court could reconsider its denial of Gump's motion to suppress given this Court's decision in **Commonwealth v. Krenzel**, 209 A.3d 1024 (Pa. Super. 2019), *appeal denied*, 222 A.3d 370 (Pa. 2019). On March 26, 2020, the court issued an order suppressing the results of the blood test. The court did not make any findings of fact and did not explain its reasoning.

---

[5] 75 Pa.C.S.A. §§ 3802(d)(2) and 3714.

[6] 75 Pa.C.S.A. §§ 3802(d)(1)(i) and (ii).

Trial Court Order, 3/26/20, at unnumbered 1-3. The Commonwealth timely appealed.[7] The Commonwealth presents a single question for review:

> Did the court err in suppressing [Gump]'s blood draw results pursuant to **Commonwealth v. Krenzel**, 209 A.3d 1024 ([Pa. Super.] 2019)?

Commonwealth Brief at 4.

We begin with our well-settled standard of review:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

---

[7] Both the trial court and the Commonwealth have technically complied with Pennsylvania Rule of Appellate Procedure 1925. However, the trial court's Rule 1925(a) statement merely adopts its September 2019 findings of fact issued from the bench and its March 2020 order granting reconsideration and suppressing the results of the blood draw. Thus, there is nothing in the record explaining the trial court's basis for reversing its original denial of the motion to suppress. **See** Pa.R.A.P. 1925(a) ("the judge who entered the order . . . if the reasons for the order do not already appear of record, shall . . . file of record at least a brief opinion of the reasons for the order, or for the rulings . . . or shall specify in writing the place in the record where such reasons may be found."). **We emphasize it is not this Court's role to guess why the trial court reversed itself**. We have explained the purpose of a trial court opinion "is to provide the appellate court with a statement of reasons for the order . . . entered . . . to permit effective and meaningful review of the lower court decisions." **Commonwealth v. Hood**, 872 A.2d 175, 178 (Pa. Super. 2005).

*Commonwealth v. Vetter*, 149 A.3d 71, 75 (Pa. Super. 2016) (citations omitted).

"The Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures." *Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa. Super. 2012). The "administration of a blood test . . . performed by an agent of, or at the direction of the government" constitutes a search under both the United States and Pennsylvania Constitutions. *Commonwealth v. Kohl*, 615 A.2d 308, 315 (Pa. 1992). "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." *Commonwealth v. Strickler*, 757 A.2d 884, 888 (Pa. 2000). "One such exception is consent, voluntarily given." *Id.* at 888-89.

Our Supreme Court has explained:

While there is no hard and fast list of factors evincing voluntariness, some considerations include: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.

*Commonwealth v. Gillespie*, 821 A.2d 1221, 1225 (Pa. 2003) (citation omitted).

In *Birchfield*, the United States Supreme Court addressed the constitutionality of warrantless blood draws. Although the Court concluded

that warrantless blood draws are not permissible as searches incident to arrest, it determined they are permissible under the consent exception to the warrant requirement. **Birchfield**, 136 S.Ct. at 2185-86. The Court observed that its "prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply with BAC tests." **Id.** at 2185.

The United States Supreme Court further stated, however, that it is "another matter . . . for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test." **Id.** It reasoned "[t]here must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads." **Id.** Thus, "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." **Id.** at 2186.

Following the decision in **Birchfield**, PennDOT revised the DL–26 form to remove warnings that individuals suspected of DUI would face enhanced criminal penalties if they refused to submit to a blood test. **Commonwealth v. Robertson**, 186 A.3d 440, 443 (Pa. Super. 2018), *appeal denied*, 195 A.3d 852 (Pa. 2018). Subsequently, this Court invalidated Section 3804(c), holding that Pennsylvania's implied-consent law unconstitutionally "imposed criminal penalties on the refusal to submit to" a blood test. **Commonwealth v. Evans**, 153 A.3d 323, 331 (Pa. Super. 2016). Thus, where a defendant

consented to a blood draw after receiving Pennsylvania's pre-**Birchfield** implied consent warnings, the blood draw was unconstitutional because consent was elicited following warnings relating to the now-invalidated increased, mandatory penalty for refusal to consent. *Id.*

Pennsylvania's current implied consent law is set forth at 75 Pa.C.S.A. § 1547, which in pertinent part provides:

> **(a) General rule.--**Any person who drives, operates or is in actual physical control of the movement of a vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a vehicle in violation of section 1543(b)(1.1) (relating to driving while operating privilege is suspended or revoked), 3802 (relating to driving under influence of alcohol or controlled substance) or 3808(a)(2) (relating to illegally operating a motor vehicle not equipped with ignition interlock).
>
> **(b) Civil penalties for refusal.—**
>
> (1) **If any person placed under arrest** for a violation of section 3802 is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person[.]
>
> * * *
>
> (2) It shall be the duty of the police officer to inform the person that:
>
> > (i) the person's operating privilege will be suspended upon refusal to submit to chemical testing and the person will be subject to a restoration fee of up to $2,000; and

(ii) if the person refuses to submit to chemical breath testing, upon conviction or plea for violating section 3802(a)(1), the person will be subject to the penalties provided in section 3804(c) (relating to penalties).

75 Pa.C.S.A. § 1547 (emphasis added).

The Pennsylvania Supreme Court examined Section 1547 in **Commonwealth v. Myers**, 164 A.3d 1162 (Pa. 2017), where a defendant who had been arrested for suspected DUI was hospitalized and unconscious when the police officer read him the consent form and directed hospital staff to draw his blood.[8] **Id.** at 1165. The Court opined:

[O]nce a police officer establishes reasonable grounds to suspect that a motorist has committed a DUI offense, that motorist "shall be deemed to have given consent to one or more chemical tests of breath or blood for the purpose of determining the alcoholic content of blood or the presence of a controlled substance." 75 Pa.C.S. § 1547(a). Notwithstanding this provision, Subsection 1547(b)(1) confers **upon all individuals under arrest for DUI** an explicit statutory right to refuse chemical testing, the invocation of which triggers specified consequences. **See** 75 Pa.C.S. § 1547(b)(1) ("If **any person placed under arrest** for [DUI] is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted"). The statute grants an

_____

[8] In **Commonwealth v. Jones-Williams**, 237 A.3d 528, 531 (Pa. Super. 2020), the appellant's car collided with a train and he was transported to the hospital. First responders at the scene had told police that they smelled marijuana on appellant. **Id.** When police arrived at the hospital, they were unable to obtain a consent from appellant because he was unconscious. **Id.** at 532. Nonetheless, they ascertained that the hospital had drawn blood for medical purposes, and without obtaining a warrant, requested that the hospital transfer a blood sample to a police laboratory for testing; the hospital complied. **Id.** On appeal, this Court relied on **Myers** in holding that the trial court erred in finding exigent circumstances to justify the warrantless blood draw. **Id.** at 544-45. We find **Jones-Williams** inapposite because, unlike Gump's case, the facts are different and most significantly, the legal analysis involved implied — as opposed to actual — consent.

explicit right to a driver **who is under arrest for [DUI]** to refuse to consent to chemical testing.

Under this statutory scheme, **a motorist placed under arrest for DUI** has a critical decision to make.  **The arrestee** may submit to a chemical test and provide the police with evidence that may be used in a subsequent criminal prosecution, or **the arrestee** may invoke the statutory right to refuse testing, which: (i) results in a mandatory driver's license suspension under 75 Pa.C.S. § 1547(b)(1); (ii) renders the fact of refusal admissible as evidence in a subsequent DUI prosecution pursuant to 75 Pa.C.S. § 1547(e); and (iii) authorizes heightened criminal penalties under 75 Pa.C.S. § 3804(c) if **the arrestee** later is convicted of DUI.  In very certain terms, this Court has held that, in requesting a chemical test, the police officer must inform **the arrestee** of the consequences of refusal and notify **the arrestee** that there is no right to consult with an attorney before making a decision.  **An arrestee** is entitled to this information so that his choice to take a [chemical] test can be knowing and conscious.  The choice belongs to **the arrestee**, not the police officer.

*Id.* at 1170-71 (some quotation marks, brackets, case cites, and footnote omitted) (emphases added).  Our Supreme Court repeatedly stressed it is an arrest which triggers the warning requirement because Section 1547 penalties apply only upon arrest.  *See id.* at 1175 n.12.

In *Krenzel*, we relied on *Myers* in concluding the trial court erred by failing to suppress blood test results, where the defendant consented to the blood test, but had not "receiv[ed] a recitation of her rights under DL-26B or Section 1547 or confirming her consent by signature."  *Krenzel*, 209 A.3d at 1032.  We described the facts giving rise to the request for the blood test as follows:

On November 14, 2016, Appellant was pulled over by Officer Kyle Maye and Officer [Robert] Gilbert as the result of her erratic driving behavior that was called in by another motorist.  Officer

> Maye observed Appellant to have glassy and bloodshot eyes, her speech was slow and soft, and her movements in the vehicle were slow and sluggish. Officer Gilbert discovered two beer bottles in the passenger side area of Appellant's vehicle. Officer Maye requested that Appellant exit the vehicle, at which time he detected the odor of alcohol. He then conducted a series of field sobriety tests, the results of which indicated that Appellant was under the influence of alcohol and/or controlled substances. Officer Maye asked if Appellant was willing to submit to a blood test. Appellant consented. She was then placed under arrest and transported to Chester County Hospital where her blood was drawn within the appropriate two-hour limit.

*Id.* at 1026. The appellant in ***Krenzel*** was most likely driving under the influence, was about to be arrested regardless of whether she consented to the blood test, and in fact, was placed under arrest as soon as she verbally consented. ***See id.*** Under these circumstances, where a refusal to consent would have resulted in the imposition of the civil penalties enumerated in Section 1547, the appellant was entitled to receive the DL-26B warnings. ***Id.*** at 1032.

In contrast, the trial court in this case determined Appellant **was not under arrest**; in fact, Gump was not arrested or issued a citation at the time of the accident. ***See*** Order, 9/20/19, at unnumbered 2-4. As stated above, the criminal complaint was not filed, and the summons was not issued, until more than two months later. The trial court cited these findings, which are supported by the record, in its September 20, 2019 order and Rule 1925(a) opinion.

Unlike the defendant in ***Krenzel***, at the time of the November 6, 2018 accident, Gump did not face imminent arrest or the penalties of Section 1547

if he refused to consent to the blood test. Significantly, Officer Bates testified that when he encountered Gump at the accident scene, he did not detect signs of intoxication. He described Gump as cooperative and testified Gump was "a little jittery but nothing of those circumstances that would indicate, you know, anything going wrong at the time. He was just upset at having had a traffic accident." N.T., 9/20/19, at 9. Officer Bates further testified he did not ask Gump to submit to field sobriety tests because he did not perceive a basis for them. *Id.* at 20. He stated he questioned Gump about possible drug use only because his pupils appeared constricted for the time of day. *Id.* Officer Bates reiterated that he did not place Gump under arrest that day, and immediately following the blood test, Gump left the hospital and was not given a citation. *Id.* at 11-12, 14, 28.

Also unlike the defendant in *Krenzel*, Gump signed a written consent to search. While we agree with the trial court that the form is not artfully drafted for the purpose of blood testing, it was nonetheless specific as to Gump's right to refuse consent. *See* Trial Court Order, 9/20/19, at unnumbered 4; N.T., 9/20/19, at Commonwealth Exhibit 1.

On this record, we infer — given the trial court's lack of explanation — that it read *Krenzel* as requiring DL-26B warnings in suspected DUI cases regardless of whether an individual is under arrest. If that is the case, we disagree. *See* Trial Court Order, 3/26/20, at unnumbered 2. Our review of

*Krenzel* does not support that interpretation, which would conflict with the express language of the DL-26B form, which states:

> You are **under arrest** for driving under the influence of alcohol . . . [t]he above operator **was placed under arrest** for driving under the influence of alcohol or a controlled substance. . . [p]lease list name, badge number, and phone number of **arresting officer**. . .

DL-26B (6-16) (emphases added). Given this unambiguous language, there was no reason for Officer Bates to read warnings to Gump, because at the time of the accident, Officer Bates was not persuaded Gump was DUI, as evidenced by the fact that Officer Bates did not place Gump under arrest. Likewise, as discussed above, Section 1547 and the Supreme Court's holding in *Myers* do not support suppression.[9] For all of these reasons, we find the trial court misapplied the law, *see Vetter*, *supra* at 75, and therefore reverse.

Order reversed. Case remanded. Jurisdiction relinquished.

_____

[9] On September 18, 2020, the undersigned issued a non-precedential decision in *Commonwealth v. Runyon*, 240 A.3d 945 (Pa. Super. 2020) (unpublished memorandum), in which we applied *Krenzel* and affirmed the grant of suppression where the driver allegedly consented to a blood draw. *Runyon*, 24 A.3d at **1, 5. As we noted throughout, our review was limited because the Commonwealth never had the suppression hearing transcribed, and both parties agreed that *Krenzel* was controlling. *Id.* at **2, 4-5. It was not clear whether the appellant was under arrest when he allegedly consented to the blood test, but we were unable to ascertain the circumstances surrounding the alleged consent. Thus, the Commonwealth did not raise and we did not address whether *Krenzel* applies to a person not under arrest for DUI. Instead, the Commonwealth first argued *Krenzel* was wrongly decided, an issue that was beyond our authority. *Id.* at *4. The Commonwealth also argued that *Krenzel* should not apply to cases involving commercial driver licenses, an issue we found waived. *Id.* at *5. Thus, our decision affirming suppressing in *Runyon* is inapplicable.

Judge McCaffery joins the memorandum.

Judge Olson files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/16/2021